FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
NOV 10 2026
TAMMY H. DOWNS, CLERK
By: DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

**Kimberly Gibson and Clinton Tylar Gibson,**
Plaintiffs,

v. Case No. 3:26-cv-306-BSM

**Intervest Corp., and Paragould Apartments I L.P.,**
Defendants.

**COMPLAINT**

Kimberly Gibson and Clinton Tylar Gibson ("Tylar Gibson") (collectively, "Plaintiffs") bring this action for damages, declaratory judgment, and permanent injunctive relief for violations of their rights under Section 504 of the Rehabilitation Act of 1973; the Fair Housing Act, as amended, 42 U.S.C.A. §§ 3601 *et seq.*; and the Arkansas Deceptive Trade Practices Act; as well as for breach of contract and unjust enrichment.

**PRELIMINARY STATEMENT**

1. This is a civil rights action brought by Plaintiffs, Kimberly Gibson and her son, Tylar Gibson, to redress housing discrimination on the basis of disability and retaliation in violation of the Rehabilitation Act, 29 U.S.C. § 794, and the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, perpetrated by Defendants: Intervest Corp., and Paragould Apartments I L.P..

2. Both Plaintiffs are persons with severe vision impairment, a physical disability that substantially limits one or more major life activities. Kim Gibson also has severe arthritis that limits her mobility, and a disorder that impacts her blood pressure.

3. Defendant, Paragould Apartments I L.P., ("Paragould Apartments") is the recipient of a USDA Rural Housing Services section 515 subsidy ("RHS 515"), and as a result, Defendants are bound by the statutes and regulations relevant to that subsidy.

This case assigned to District Judge Miller
and to Magistrate Judge Ervin

4. Plaintiffs, because of their disabilities, require reasonable accommodations to have an equal opportunity to use and enjoy their respective dwellings.

5. Both Plaintiffs made written requests for reasonable accommodations that would enable them to safely use their dwellings, and navigate the premises unassisted. Those requests were also followed by subsequent requests through counsel.

6. Defendants, despite receiving clear and documented requests for accommodations, refused to grant the request or engage in an interactive process.

7. Instead, following Plaintiffs' protected assertions of their housing rights, Defendants retaliated against Plaintiffs, including by sending non-renewal notices to both Plaintiffs—without a lawful basis for doing so—to force Plaintiffs from their homes.

8. Defendants' ongoing failure to accommodate Plaintiffs and their subsequent retaliatory conduct violate Section 504 of the Rehabilitation Act, the Fair Housing Act at 42 U.S.C. § 3604(f)(3)(B) and § 3617, the Arkansas Deceptive Trade Practices Act, and the program regulations imputed into Plaintiffs' leases.

9. Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, and an award of reasonable attorney's fees.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over all federal claims in this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1651.

11. This Court is entitled to exercise supplemental jurisdiction over the state claims in this action pursuant to 28 U.S.C. § 1367.

12. The events giving rise to this Complaint occurred on housing project premises located in Greene County, Arkansas; and Greene County is in the Northern Division of the United States District Court for the Eastern District.

13. Therefore, venue is proper in the Northern Division of the United States District Court for the Eastern District under 28 U.S.C. § 1391(b)(2) because the real property that is the subject of the action is situated in Greene County, and a substantial part of the events, acts, and/or omissions giving rise to this action occurred, and continue to occur, in Greene County.

## PARTIES

### I. Plaintiffs

14. There are two (2) Plaintiffs: (1) Kimberly Gibson, who lives in Unit 12 of Paragould Apartments, located at 219 Bogil Rd in Paragould, Arkansas 72450; and (2) Tylar Gibson, who lives in Unit 7 of the same complex.

15. Plaintiffs are relatives: mother and son.

16. Both Plaintiffs suffer from retinitis pigmentosa, a rare genetic condition that causes the slow breakdown of light-sensitive cells in the retina, leading to progressive vision loss.

17. Kimberly Gibson also suffers from severe and disabling arthritis, and a blood pressure disorder.

18. Tylar Gibson has resided at Paragould Apartments since 2022 pursuant to a standard lease. *See Exhibit 1*

19. Kimberly Gibson has resided at Paragould Apartments pursuant to a substantially similar lease since 2025. *See Exhibit 2.*

### II. Defendants

20. There are two (2) Defendants.

21. Paragould Apartments I, L.P. is a foreign limited partnership, and the record owner of Paragould Apartments, located at 219 Bogil Rd. in Paragould, AR.

22. Intervest Corporation ("Intervest") is a foreign for-profit corporation registered in Mississippi (and not registered with the Secretary of State in Arkansas), and the property manager for Paragould Apartments.

## STATEMENT OF FACTS

### I. Defendants accept a federal housing subsidy for a multi-family project, of which Plaintiffs are tenants.

23. The United States Department of Agriculture ("USDA") administers the Rural Rental Housing Program, established by Section 515 of the Housing Act of 1949.

24. Borrowers participating in Section 515 programs receive interest credits that result in well below-market rate financing. Rural Housing Service, U.S. Dep't of Agric., HB-3-3560, Multi-Family Housing Project Servicing Handbook, § 1.5 (2026).

25. Paragould Apartments receives a federal subsidy under Section 515 (expected to continue to 2039), identified as HUD Subsidy ID 412681157011. *See Exhibit 3*

26. Paragould Apartments also holds itself out as a subsidized landlord by including iconography indicating its USDA subsidized status on its signage and some forms.

### II. Defendants know that Plaintiffs are qualified federally subsidized tenants with a disability.

27. Both Plaintiffs suffer from severe progressive vision loss caused by retinitis pigmentosa.

28. Defendants know that Kimberly and Tylar Gibson are qualified individuals with a disability because the condition is obvious, because they have access to Plaintiffs' income records through the recertification process, and because Plaintiffs have informed them on multiple occasions.

29. Defendants also know that Kimberly Gibson requires the assistance of service dogs due primarily to mobility issues associated with her arthritis, but also to assist with managing her blood pressure, and avoiding obstacles in her path.

30. Defendants are aware that both Plaintiffs require the assistance of direct support personnel during the day due to disability.

31. Defendants are also aware that Paragould Apartments receives a federal subsidy.

**III. Plaintiffs, due to severe vision impairment, require accommodations in order to have an equal opportunity to use and enjoy their homes.**

32. Retinitis pigmentosa ("RP") causes night-blindness, loss of peripheral and central vision, difficulty seeing moving objects or adjusting to changes in light. The experience has been described as progressively worsening blurry tunnel vision. Although the effects of the disorder are progressive and individualized, RP indicates a severe vision impairment that substantially limits the major life activity of seeing.

33. Therefore, people with RP may require accommodations to safely navigate a property, utilize facilities, and generally enjoy housing on an equal basis with tenants that do not have disabilities.

34. Tylar Gibson's lease agreement reflects an occupancy commencement date of December 1, 2025, a security deposit of $250, and a monthly subsidized rental rate of $366/month.

35. Kimberly Gibson's lease agreement reflects an occupancy commencement date of November 1, 2025, and a monthly subsidized tenant rental rate of $185/month.

36. However, Linda Cook demanded and ultimately received a security deposit of $827 from Ms. Gibson.

37. Ms. Cook also failed to write the amount of the security deposit being charged in Ms. Gibson's lease.

38. In late November of 2025, a pest control professional inspected Ms. Gibson's unit, and identified a rodent infestation with multiple access points. He recommended filling the access points with steel wool prior to patching them to prevent immediate reinfestation.

39. Towards the end of February, Linda Cook's nephew moved into the unit above Ms. Gibson and began parking in the parking space on the end of the row of parking spaces, next to the dumpster; the spot that Ms. Gibson had come to rely on for locating her transportation.

40. At that time, Ms. Gibson requested a designated parking spot, and was told that designating parking spots was not Paragould Apartments' policy, and that no exception would be made for her.

41. Kimberly Gibson, due to her mobility and vision impairments, requires a parking space near her unit to be marked as designated for her use. Without a parking space reserved for her use near her apartment, Ms. Gibson cannot reliably locate or access her transportation, and is subjected to an unreasonable risk of bodily injury, substantially different in kind and magnitude from the dangers that a nondisabled person experiences in parking lots.

42. On or about April 20, 2026, Plaintiff Tylar Gibson requested a reasonable accommodation for a marked parking space located near his unit via text message to Linda Cook.

43. Tylar Gibson, due to his vision impairment, requires a marked parking spot near his unit so that he can safely and reliably navigate to his transportation from his apartment, and vice versa. Without a parking space near his unit, Mr. Gibson cannot consistently locate his transportation, and he is subjected to an unreasonable risk of injury substantially different in kind and magnitude from the dangers that a nondisabled person experiences in parking lots.

44. Linda Cook denied the requested accommodation by text message on the basis that Paragould Apartments does not have a policy of assigning parking spaces.

45. Jason Auer, former staff attorney at Disability Rights Arkansas, sent a letter requesting a marked parking spot as a reasonable accommodation on April 23, 2026. *See Exhibit 4.*

46. On or about April 29, 2026, Kimberly Gibson requested a reasonable accommodation from Respondents for the repair or installation of outdoor lighting on the back half of the complex, where her unit is located and where she is required to take her service dogs to relieve themselves.

47. Her request for accommodation was prompted by an incident wherein Ms. Gibson had extreme difficulty, under relatively clear conditions, finding her way back to her unit after taking her service dogs out.

48. There are ample options for adding exterior lighting. There is a utility pole that could support exterior lighting, and there is also a pole with wiring (and a lightbulb) that once supported exterior lighting that could be repaired. *See Exhibit 5.*

49. At the same time, Ms. Gibson requested that the tree stumps around her unit be marked with a high visibility paint as they currently constitute serious safety hazards given her vision impairment.

50. After receiving no response for a period of two (2) months, Ms. Gibson followed up on her request by text message on June 29, 2026.

51. By July 30, 2026, Ms. Gibson had acquired counsel, who submitted a written accommodation request on Ms. Gibson's behalf. The July 30th accommodation request also included requests for a reserved parking spot and the remedy recommended by pest control professionals to prevent rodent reinfestation of her unit. *See Exhibit* 6.

52. Ms. Gibson requires pest control services that not only treat infestation, but also prevent reinfestation, because Ms. Gibson cannot reliably mitigate her exposure to rodent excrement in her environment due to her disability.

**IV. Defendants discriminated in the provision of services on the basis of Plaintiffs' disabilities.**

53. Defendant's attorney responded to the written request that Mr. Auer submitted for Tylar Gibson on behalf of Defendants, denying Mr. Gibson's request for a designated parking spot by telephone and by email on April 28, 2026, without requesting more information, engaging in an interactive process, or providing a reason for the denial.

54. On June 29th, Kimberly Gibson followed up on her lighting request via text message.

55. Defendants denied Kimberly Gibson's accommodation requests by text message on or about July 13, 2026, without providing an applicable reason for the denial, requesting additional information, or engaging in an interactive process regarding the accommodation request.

56. Defendants never responded at all to the written request that Ms. Gibson's attorney submitted on her behalf.

57. Prior to filing the instant Complaint, the only repair made in Ms. Gibson's unit was the application of foam to the rodent access points. There are still holes in the wall.

58. Kimberly Gibson also alleges that Defendants deceptively and illegally assessed pet deposits for her service animals, and labeled them security deposits to obscure the nature of the expense.

**V. Defendants retaliated—and continue to retaliate—against Plaintiffs for the exercise of their civil rights.**

59. On July 13, 2026, the same day that her reasonable accommodation request was denied, Defendants delivered a notice that Plaintiff, Kimberly Gibson's lease would not be renewed. *See Exhibit 7.*

60. On July 13, 2026, a substantially similar notice was also delivered to Tylar Gibson. *See Exhibit 8.*

61. Neither notice contained a specific factual basis for the adverse action or referenced specific provisions that had been violated, as required under 7 C.F.R. § 3560.159.

62. Additionally, neither Plaintiff had received any prior notices of lease violation.

63. Plaintiffs' counsel responded to Defendants within 10 days noting that the notices were invalid as a matter of law.

64. Plaintiffs' counsel emailed said response to Tylar Gibson's notice on July 16, 2026, *See Exhibit* 9, and responded to Kimberly Gibson's notice on July 23, 2026. *See Exhibit 10.*

65. Defendants never responded to Plaintiff's counsel or reached out to Plaintiffs.

66. Plaintiffs began asking Linda Cook for a tenancy recertification appointment in September of 2026, but never received any response.

67. Plaintiffs' counsel sent letters demanding recertification as of right on September 15, 2026 and October 1, 2026. Defendants did not respond. *See Exhibit 11.*

68. Instead, Defendants sent an additional non-renewal notice to Tylar Gibson, signed by attorney Zachary Sellers of AR Law, on October 29, 2026. *See Exhibit 12.*

69. On November 9th, Kimberly Gibson also received a non-renewal notice signed by attorney Zachary Sellers of AR Law. However, the notice was dated October 30th. *See Exhibit 13*

70. At this time, Plaintiffs are forced to file suit to prevent retaliatory and otherwise unlawful eviction from their subsidized housing.

71. Plaintiffs have incurred and continue to incur actual and economic damages from Paragould Apartments I L.P. and Intervest's violations of the Fair Housing Act, including expenses associated with exploring their options should Intervest unlawfully displace them.

72. Additionally, because of Defendants' reckless disregard for Plaintiffs' civil rights, they are entitled to punitive damages in an amount to be determined at trial.

## CAUSES OF ACTION

## COUNT ONE

### Violation of Section 504 of the 1978 Rehabilitation Act:

### (29 U.S.C. § 794)

73. Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

74. The Rehabilitation Act seeks to respond to the "societal neglect" that Americans with disabilities had previously endured, and "assure… the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance." *Alexander v. Choate*, 469 U.S. 287, 295 & 304 (1985).

75. The Rehabilitation Act applies to entities operating programs and activities that receive federal funds, such as borrowers under the RHS 515 program, and it prohibits discrimination on the basis of disability. 29 U.S.C. § 794(a).

76. The Act provides that "[n]o otherwise qualified individual with a disability…shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.*

77. The Rehabilitation Act is, therefore, one of several federal statutory schemes embracing the concept that, under some circumstances, the policies and practices of entities must be modified to accommodate the needs of people with disabilities. *Developmental Services of NE v. City of Lincoln*, 504 F. Supp.2d 714, 722 (D. Nebraska)

78. The "requirements for a 'reasonable accommodation' are the same under the FHAA, ADA, and the Rehabilitation Act." *Id.* at 723.

79. A necessary accommodation is reasonable if it would not impose an undue hardship or burden upon the entity making the accommodations and would not undermine the basic purpose which the requirement at issue seeks to achieve. *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361 (1979).

80. An accommodation is not unreasonable merely because it would contradict a traditional rule or practice. *Shapiro v. Cadman Towers, Inc.*, 844 F. Supp 116, 124; *See also* H.R. Rep No. 711, 100th Cong., reprinted in 1988 U.S.C.C.A.N. 2173.

81. Under the Rehabilitation Act, the recipient of federal funding has some obligations to fund necessary reasonable modifications. 29 U.S.C. § 794(c); *See also Evans v. ForKids, Inc.*, 306 F. Supp. 3d. 827, 839-40 (E.D. Virginia 2018).

82. Retaliation is actionable under the Rehab Act. *Hoyt v. St. Mary's Rehab. Ctr.*, 711 F.2d 864, 867 (8th Cir. 1983).

83. A refusal to renew a tenant's lease can be considered an adverse action for the purposes of a retaliation claim. *Elmowitz v. Executive Towers at Lido, LLC*, 571 F. Supp. 2d 370 (2008).

84. Paragould Apartments receives federal funding under the RHS 515 program, and is therefore bound by Section 504 of the Rehabilitation Act.

85. Defendants made no effort to accommodate or engage with Plaintiffs after they made requests for accommodations. Therefore, Defendants violated the Rehabilitation Act by subjecting Plaintiffs to discrimination and denying them the benefits of the RHS 515 program.

86. After refusing to engage in an interactive process concerning the reasonable accommodations that Plaintiffs requested, Defendants retaliated against Plaintiffs by causing non-renewal notices to be sent to Plaintiffs.

**COUNT TWO**

**Violation of the Fair Housing Act: Discrimination**

**(42 U.S.C. § 3604(f))**

87. Plaintiffs repeat and re-allege the preceding paragraphs as if set forth herein.

88. The Fair Housing Act prohibits discrimination against tenants with disabilities in the terms, conditions, or privileges of a dwelling, or in the provision of services or facilities in connection with the dwelling. 42 U.S.C. § 3604(f)(2).

89. For example, the regulations make clear that it is discriminatory to charge a person with a disability a higher security deposit than is customarily required. 24 C.F.R. § 100.203(a). That includes fees and deposits related to animals if the animal is a service dog

trained to do work or perform a task for people with disabilities. *See also* 42 U.S.C. § 3604(f); *Fair Housing of the Dakotas, Inc. v. Goldmark Property Management, Inc.*, 778 F.Supp.2d 1028 (D. North Dakota 2011).

90. Under Arkansas law, a security deposit may not exceed an amount "in excess of two (2) months periodic rent." Ark. Code Ann. § 18-16-304.

91. Additionally, Arkansas law explicitly forbids charging a security deposit for a service animal. Ark. Code Ann. § 20-14-304.

92. The Fair Housing Act also defines discrimination as including a refusal to make reasonable accommodations in rules, policies, practices, or services for tenants with disabilities when necessary to afford such a tenant with an equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3).

93. A reserved parking spot is specifically included in the implementing regulation as an example of an accommodation request that is ordinarily reasonable if necessary; denial of which would support a claim of disability discrimination. 24 C.F.R. § 100.204(b). *See also Shapiro v. Cadman Towers, Inc.*, 844 F. Supp. 116, 125 (1994).

**COUNT THREE**

**<u>Violation of the Fair Housing Act: Retaliation</u>**

**(U.S.C. § 3617)**

94. Plaintiffs repeat and re-allege the preceding paragraphs as if set forth herein.

95. The Fair Housing Act and its implementing regulations prohibit retaliating against a person for exercising their rights under the Act. 42 U.S.C. § 3617; 24 C.F.R. § 100.400

96. Retaliation can even serve as a separate basis for an FHA claim. *Reyes v. Fairfield Properties*, 661 F. Supp.2d 249 (2009).

97. If a court finds that a discriminatory housing practice has occurred or is about to occur, The Fair Housing Act specifically authorizes the court to "grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)."

98. By refusing to renew Plaintiffs' leases—particularly since Plaintiffs are entitled to renewal as of right—Defendants retaliated against Plaintiffs for exercising their rights under the Fair Housing Act. *See Elmowitz*, 571 F. Supp. 2d 370 (2008).

**COUNT FOUR**

**<u>Breach of Contract</u>**

99. Plaintiffs repeat and re-allege the preceding paragraphs as if set forth herein.

100. "In order to state a cause of action for breach of contract, the complaint need only assert the existence of a valid and enforceable contract between the plaintiff and defendant , the obligation of defendant thereunder, a violation by the defendant, and damages resulting to plaintiff from the breach." *Rablias v. Barnett*, 284 Ark. 527, 529 (1985) (quoting *Williams v. Black Lumber Co.*, 275 Ark. 144 (1982).

101. A cause of action for breach of contract accrues "when one party has, by words or conduct, indicated to the other that the agreement is being repudiated or breached." *Est. of Daniel v. Est. of Daniel*, 686 S.W.3d 512, 519 (2024) (quoting *Helms v. University of Missouri—Kansas City*, 62 Ark. App. 155, 161 (1999)).

102. When a housing provider accepts a federal subsidy, the relevant aspects of the regulatory regime associated with the subsidy are incorporated into the contracts associated with

the project, including the tenants' leases. *Normandy Apartments, Ltd. V. United States*, 116 Fed. Cl. 431, 442 (2014).

103. USDA's regulations at 7 C.F.R. Part 3560 bind participants of the RHS 515 program.

104. 7 C.F.R. § 3560.159(a) provides that "Borrowers…may…refuse to renew a tenant's lease **only** for material non-compliance with lease provisions, material non-compliance with the occupancy rules, or other good causes." (emphasis added).

105. "Good cause" includes actions "which disrupt the livability of the housing by threatening the health and safety of other persons or the right of other persons to enjoyment of the premises and related facilities; [a]ctions...which result in substantial physical damage…; or [a]ctions prohibited by state and local laws." *Id.*

106. That section further provides that "termination may only occur when the incidences related to the termination are documented and there is documentation that the tenant was given notice prior to the initiation of the termination action that their activities would result in occupancy termination." *Id.*

107. A borrower is prohibited from terminating a tenant's occupancy when a lease expires unless the tenant's occupancy could be terminated due to the tenant's conduct, or the tenant is no longer eligible for occupancy. *Id.* at (b).

108. Any notice of lease or occupancy termination must include "A statement of the basis for lease termination with specific reference to the provisions of the lease or occupancy rules that, in the borrower's judgment, have been violated by the tenant in a manner constituting material non-compliance or good cause;" among other requirements. *Id.*

109. 7 C.F.R. § 3560.103 provides Borrowers' obligations to maintain the project.

110. It requires all units to be free of visible signs of insects or rodents and must be free of signs of insect or rodent damage. *Id.* at (a)(3)(xxii). It also requires walls that are free of holes. *Id.* at (a)(3)(xvi).

111. 7 C.F.R. § 3560.103(a)(3)(viii) requires the project to have functional exterior lighting in common areas for safety and security.

112. 7 C.F.R. § 3560.104(a) requires compliance with the requirements of the Fair Housing Amendments Act of 1988, and subsection (c)(4) requires borrowers to provide reasonable accommodations ***at the project's expense*** unless doing so would result in undue financial or administrative burden on the project.

113. Defendants have breached Plaintiffs' leases by: (1) failing to keep units free of visible signs of rodents, and failing to keep units free of rodent damage; (2) Failing and refusing to maintain exterior lighting in common areas; (3) failing and refusing to engage with their obligations under the Fair Housing Act and the Rehab Act as required by 7 C.F.R. § 3560.104; (4) issuing and relying on non-compliant lease non-renewal notices; and (5) refusing to renew Plaintiffs' leases in violation of 7 C.F.R. § 3560.159.

## COUNT FIVE

## Violation of Arkansas' Deceptive Trade Practices Act

114. Plaintiffs repeat and re-allege the preceding paragraphs as if set forth herein.

115. The Arkansas Deceptive Trade Practices Act ("ADTPA") is set out at Ark. Code Ann. § 4-88-102 *et seq.*

116. The elements of an ADTPA claim are (1) a deceptive consumer-oriented act or practice which is misleading in a material respect and (2) injury resulting from such an act. *Apprentice Info Sys. V. DataScout, LLC*, 2018 Ark. 149, 5 (2018).

117. The plain language of the statute indicates that a liberal construction of the Act is appropriate. *State ex. Rel. Bryant v. R & A Inv. Co.,*

118. The ADTPA broadly prohibits "[d]eceptive and unconscionable trade practices". Ark. Code Ann. § 4-88-107(a), (a)(10), b.

119. "Unconscionable," in this context, "includes conduct violative of public policy or statute." *Baptist Health v. Murphy*, 365 Ark. 115, 128 (2006).

120. However, the Act also provides numerous examples of specific types of trade practices that are prohibited under this statute. *Id.*

121. Subsection (a)(8) makes clear that taking advantage of a consumer's disability is an unlawful and unconscionable trade practice under the Act. *Id.*

122. In passing the ADTPA, the Arkansas General Assembly provided that "[p]rotecting older adults and vulnerable adults is a priority for our state," Acts 2021, No. 1015, § 1(a), and that "protecting older adults and vulnerable adults through innovative and aggressive tactics" was a part of the intent for this legislation. *Id.* at (b)(3).

123. The ADTPA has also been used to target unlawful conduct that negatively impacts consumers, such as a failure to follow state and local building and fire codes. *See State v. Big Country Chateau*, 60CV-22-5528 (Compl., Page 11-12); *See also State v. Entropy Systems, Inc. And Imran Bohra*, 60CV-19-5560 (Compl., Pages 8-9).

124. The same theory should apply to deliberate violations of applicable federal regulations that negatively impact consumers.

125. The regulations implementing the Fair Housing Act explicitly forbid charging a person with a disability a higher than customary security deposit. 24 C.F.R. § 100.203

126. Under Arkansas law, "[a] landlord may not demand or receive a security deposit…in excess of two (2) months periodic rent." Ark. Code Ann. § 18-16-304

127. In Arkansas, it is also explicitly unlawful to charge a security deposit for a service animal. Ark. Code Ann. § 20-14-304(a).

128. RHS 515 program regulations require borrowers and their agents to make reasonable accommodations—at borrower's expense—that would not cause an undue financial or administrative burden. 7 C.F.R. § 3560.2

129. Additionally, program regulations do not permit a tenant's occupancy to be terminated when the lease expires without a record of material non-compliance with the lease or occupancy rules for the project, and there is a record that the tenant was given notice that their activities would result in occupancy termination. 7 C.F.R. § 3560.159

130. Intervest Corp. violated the ADTPA by misrepresenting the amount that it could legally charge in security deposits, and by illegally charging Kimberly Gibson an $855 security deposit.

131. Intervest Corp. violated the ADTPA by misrepresenting its ability to refuse to renew a lease without a record of a tenant's material violation of the lease and notice of said material violation. This misrepresentation injured Plaintiffs by causing them significant anxiety and leading them to invest resources in seeking other sources of housing.

132. Intervest Corp. also violated subsection (a)(8) of the Act by knowingly taking advantage of Kimberly Gibson's blindness when charging an unlawfully excessive security deposit, and not writing the amount that she was being charged in the lease.

## COUNT SIX

## <u>Unjust Enrichment</u>

133. Plaintiffs repeat and re-allege the preceding paragraphs as if set forth herein.

134. A prima facie claim for unjust enrichment requires that an entity (1) received value; (2) under circumstances that, in equity and good conscience, it ought not to retain it. *Phillips v. Denton*, 2018 Ark. App. 90 (2018).

135. Federal subsidies, such as RHS 515, have significant pecuniary value. Borrowers participating in the RHS 515 program generally receive funding at a 1% effective interest rate. HB-3-3560-MFH Project Servicing Handbook, §2.4.

136. If the borrower does not abide by the regulations for the program providing said value, then, in equity and good conscience, the borrower ought not retain that value, because they are not providing the consideration that they exchanged for it.

137. If a subsidized borrower refuses to follow the program regulations for the program that subsidizes them, then unjust enrichment may only be avoided by requiring the borrower to abide by program regulations.

138. RHS 515 program regulations affirmatively require borrowers and their agents to make reasonable accommodations—at borrower's expense—that would not cause an undue financial or administrative burden. 7 C.F.R. § 3560.2

139. RHS 515 regulations also do not permit a tenant's occupancy to be terminated when the lease expires unless there is a record of material non-compliance of the lease or occupancy rules for the project, and there is a record that the tenant was given notice that their activities would result in occupancy termination. 7 C.F.R. § 3560.159

140. Nonetheless, Paragould Apartments, through its agent, Intervest Corp., did refuse Plaintiffs' requests to make reasonable accommodations without making an effort to determine whether those accommodations would cause an undue financial or administrative burden.

141. Subsequently, Intervest Corp. refused to renew Plaintiffs' leases, in violation of 7 C.F.R. § 3560.159

142. Injustice can only avoided by requiring Defendants to (1) renew Plaintiffs' leases and (2) engage in an interactive process concerning Plaintiffs' reasonable accommodation requests.

**Request for Temporary Restraining Order and Preliminary Injunction**

143. If a court finds that a discriminatory housing practice has occurred or is about to occur, the Act specifically authorizes that court to "grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." 42 U.S.C. § 3613(c)(1).

144. Plaintiffs are entitled to continued occupancy in their respective units unless and until there is a record of their material non-compliance with the lease or occupancy rules, and there is a record that they were given notice that those activities would result in occupancy termination.

145. Nonetheless, Paragould Apartments, through its agent, Intervest Corp., has provided Plaintiffs with notice that it will refuse to renew their leases in November, and that Plaintiffs' tenancies will terminate on November 30th. The notice provides that Plaintiffs must "vacate the premises and return possession of the unit" prior to 11:59 p.m. on November 30, 2026.

146. Intervest Corp has sent correspondence from their attorney to Tylar Gibson as recently as October 29, 2026 stating that his lease will not be renewed.

147. Intervest Corp has sent correspondence from their attorney to Kimberly Gibson as recently as November 9, 2026 stating that her lease will not be renewed.

148. Although theoretically Plaintiffs would have an opportunity to defend a discriminatory eviction in state court, doing so would be a great hardship.

149. If Plaintiffs are evicted, they will suffer irreparable harm including loss of their dwellings, potential homelessness, a record of eviction that could make securing future housing difficult, a detrimental effect on their health, and ineligibility for other subsidized housing.

150. Plaintiffs are current on their rent, and have never been provided with notice of a violation of their lease agreements or the occupancy rules.

151. Paragould Apartments will not suffer any financial harm if preliminary relief is granted.

152. Plaintiffs live off small, fixed incomes, and request that temporary relief be issued without bond.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Enter (or set a hearing for) a preliminary injunction preventing Defendants from unlawfully evicting the Plaintiffs;

b. Require Defendants to engage in an interactive process concerning Plaintiffs' requested accommodations;

c. Award compensatory and punitive damages;

d. Issue an order granting Plaintiffs reasonable attorney's fees and costs; and

e. Grant any further relief that this Court deems necessary.

Respectfully Submitted,

Kimberly Gibson and

Tylar Gibson

By: _/s/Adrieanna Hutson________

Adrieanna Hutson
Disability Rights Arkansas
Ark. Bar No. 2023013
400 W. Capitol Ave., Ste. 1500
Little Rock, Arkansas 72201
Telephone: (501) 492-5753
Facsimile: (501) 492-5753

# AFFORDABLE HOUSING ASSOCIATION OF ARKANSAS, INC. LEASE AGREEMENT

LANDLORD: Intervest Corp.

APARTMENT COMPLEX: Paragould Apts.

(Landlord's Address) 219 Bogil Road City Paragould State AR Zip 72450

TENANT(S) Clinton Tyler Gibson

OTHER OCCUPANT(S) OF APARTMENT \

LEASED PREMISES (Unit) Apartment # 7, a 1 bedroom apartment located at 219 Bogil Road Paragould, AR. 72450 RENTAL RATE/MO. 366.00

**SECTION ONE (LEASE TERM)**

The term of this Lease Agreement (the "Term") shall be for one (1) year, commencing on 12/01, 2025 and ending on 11/30, 2026 unless sooner terminated by either party in accordance with the provisions of this Lease Agreement. If Landlord and Tenant enter into a new lease agreement at the end of the Term, thereafter this Lease Agreement shall no longer be effective. If Tenant is allowed to occupy the Leased Premises (defined below) after the end of the Term and without signing a new lease agreement, such occupancy shall be exclusively on a month-to-month basis, terminable by Landlord or Tenant upon one (1) month's notice (or sooner if allowed by Sections Three, Fifteen and Seventeen of this Lease Agreement). In consideration of the mutual agreements and covenants of Landlord and Tenant set forth in this Lease Agreement, Landlord hereby leases to Tenant(s) and Tenant(s) hereby leases from Landlord for use in accordance with Section Fourteen, the Leased Premises, together with the fixtures and accessories belonging thereto, for the Term. All parties listed above as Landlord and Tenant(s) are herein referred to individually and collectively as Landlord and Tenant, respectively.

**SECTION TWO (AGENCY DISCLOSURE) (CHECK ONE)**

☐ The Apartment Complex is not managed by a Real Estate Licensee and agency disclosure is not required.

☑ The Apartment Complex is managed by a Real Estate Licensee/Managing Agent and agency disclosure is required. Tenant has read and signed the following statement prior to entry into and execution of this Lease Agreement:

"I understand that the Managing Agent/Real Estate Licensee is acting solely as agent for the Landlord and that this fact was disclosed to me prior to any confidential information being provided to the agent for Landlord."

Tenant: X

Tenant: ________

**SECTION THREE (RENTAL)**

All rents are due and payable monthly in advance either at the Landlord's office in the Apartment Complex, or at a different address provided to Tenant by Landlord in writing, on or before the FIRST DAY OF EACH CALENDAR MONTH without necessity of demand by Landlord. In addition to any rent due, a late payment penalty of the greater of Ten Dollars ($10.00) or an amount equal to five percent (5%) of the Tenant's gross tenant contribution (as described at line 31 of USDA Rural Development (hereinafter "RD") (RD being formerly known as Farmers Home Administration, or FmHA) Form 3560-8 and Section Four of this Lease Agreement) (the "GTC") will be collected for any rent paid after the 1st of the month. All payments, whether for rental obligations, security deposit, application fee, late charges, or any other financial obligations, from Tenant to Landlord, shall be paid by check or money order. All checks, money orders and the like shall be made payable to Landlord. Tenant agrees to pay a charge of $ 10.00 to cover the cost of handling and collection of any check returned by a bank due to insufficient funds, closed account or for any other reason. Landlord agrees to accept rental payments without regard to any other charges owed by Tenant to Landlord and to seek separate legal remedy for the collection of any other charges which may accrue to Landlord from Tenant(s) and acceptance of any such rental payment shall not be deemed a waiver by Landlord of any default by Tenant or the right to collect any other charges owed by Tenant. The acceptance of partial payments by Landlord for any month or months shall not constitute a waiver by Landlord that the monthly rent is due in full on or before the first (1st) day of the month. If Tenant has not paid current month's rent within 5th (__) days after due date, Landlord shall have the option to terminate this Lease Agreement and take possession of the Leased Premises upon giving three (3) days' written notice to Tenant of such nonpayment and Landlord's termination of this Lease Agreement.

**SECTION FOUR (CHECK ONE)**

☐ BASIC RENT: Tenant understands and agrees that the GTC, as determined on the latest Form RD 3560-8, which must be attached to this Lease Agreement, for rent or occupancy charge and utilities, will be $________. If Tenant pays any or all utilities directly (not including telephone or cable TV), a utility allowance of $________ will be deducted from Tenant's gross monthly rent or occupancy charge, except that Tenant will not pay less than the basic rent nor more than the note rate rent or occupancy charge stated below. Tenant's net monthly rent or occupancy charge will be $________. Tenant also understands and agrees that Tenant's monthly tenant rent or occupancy charge under this Lease Agreement may be raised or lowered, based on changes in the household composition, number, age, student or disability status of persons living in the Leased Premises, and on the escalation clause in this Lease Agreement. Tenant's rent or occupancy charge will not, however, be less than $________ (basic) nor more than $________ (note rate) during the Term of this Lease Agreement, except that, based on the escalation clause in this Lease Agreement, these rental rates or occupancy charges may be changed by a rent or occupancy charge change approved by RD.

☑ RENTAL ASSISTANCE: Tenant understands and agrees that, as long as Tenant receives rental assistance, Tenant's gross monthly contribution (as determined on the latest Form RD 3560-8) (which must be attached to this Lease Agreement) for rent or occupancy charge and utilities will be $ 108. If Tenant pays any or all utilities directly (not including telephone or cable TV), a utility allowance of $ 108 will be deducted from Tenant's gross monthly contribution and Tenant's resulting net monthly contribution will be $ 108. If Tenant's net monthly contribution would be less than zero, Landlord will pay to Tenant the sum of $ 108.

Tenant also understands and agrees that Tenant's monthly contribution under this Lease Agreement may be raised or lowered, based on changes in the household income or adjustments to income, failure to submit information necessary to certify income, changes in the household composition or number, age, student or disability status of persons living in the household, and on the escalation clause in this Lease Agreement. Should Tenant no longer receive rental assistance as a result of these changes, or the rental assistance agreement executed by the owner and RD expires, Tenant understands and agrees that Tenant's monthly contribution may be adjusted to no less than

The Security Deposit will be held without interest and may be deposited in a bank account with other tenants' security deposits, or may be held by Landlord and not in the trust account of any Real Estate Licensee who may manage the Apartment Complex. The Security Deposit is not advance rent and cannot be applied to rent by Tenant unless Tenant defaults under this Lease Agreement and Landlord elects to terminate this Lease Agreement, upon such event Landlord may so apply the Security Deposit without waiving any right against the Tenant provided by this Lease Agreement or applicable law. Following termination and delivery of possession of the Leased Premises to Landlord, the Security Deposit will be delivered to Tenant at any forwarding address provided by Tenant to Landlord in writing, otherwise to the last address of Tenant actually known to Landlord, only after all of the following conditions have been met:

1. The Term of this Lease Agreement must have expired or terminated without default by Tenant.
2. Thirty (30) days' written notice must have been properly given to Landlord prior to vacating the Leased Premises.
3. The Leased Premises have been cleaned thoroughly (including the carpet) and no damage beyond normal wear and tear is present in or about the Leased Premises.
4. If additional cleaning or other work is required to repair damages to the Leased Premises, appropriate charges will be withheld from the Security Deposit to accomplish the necessary cleaning or repairs. To determine the Tenant's obligation for such additional cleaning and/or repairs, Landlord shall be responsible for providing Tenant with a written statement of the condition of the Leased Premises, both at initial occupancy and when Tenant vacates the Leased Premises. Tenant may and is encouraged to be present at both inspections.

**SECTION SEVEN (ACCESSIBLE UNITS)**

☐ The Leased Premises is not an accessible unit specially designed for persons with disabilities.

☐ The Leased Premises are believed by Landlord to be an accessible unit, specially designed for persons disabilities and the Tenant household has a person with a disability.

☐ The Leased Premises are believed by Landlord to be an accessible unit, specially designed persons disabilities and the Tenant does not have a person with a disability in the household. Tenant understands and agrees with the following statement: "I acknowledge that I am occupying a designated accessible unit. I acknowledge that priority for such units is given to those needing special physical design features. I acknowledge that I am permitted to occupy the Leased Premises until Landlord issues a notice that a priority applicant is on the waiting list and that I must move to another suitably sized vacant unit in the Apartment Complex. Upon receiving such notice, I agree to move, at my own expense, within thirty (30) calendar days to another vacant unit in the Apartment Complex if one is available. I further understand that my rental rate will change, when appropriate, to the rental rate for the unit I move to and this Lease Agreement will be modified accordingly."

**SECTION EIGHT (REPORTING CHANGES/EXTENDED ABSENCES)**

1. Tenant agrees to immediately notify the Landlord when there is a change in the Tenant's gross income or adjusted income, or when there is a change in the household composition, number, age, student or disability status of persons living in the Leased Premises. Tenant understands that rent or benefits may be affected as a result of this information. Tenant also understands that failure to report such changes may result in loss of benefits to which Tenant may be entitled or may result in the Landlord taking corrective action if benefits were mistakenly received. Tenant understands that the corrective action the Landlord may take includes the initiation of a demand for repayment of any benefits or rental subsidies improperly received, initiation of a notice to cancel any rental assistance from RD or HUD Section 8 assistance being received for the balance of Tenant's certification period, initiation of a notice to increase monthly rent to $ 810 per month (note rate rent for Plan II projects or 125 percent (125%) of rent in Plan I projects), or initiation of a notice of termination. Tenant understands and agrees that one or more of these remedies may be initiated at the option of the Landlord.
2. Tenant understands that Tenant must promptly notify the Landlord of any extended absences and that if Tenant does not personally reside in the Leased Premises for a period exceeding sixty (60) consecutive days, for reason other than health or emergency, the net tenant contribution shall be raised to $ 1004 per month (note rate rent for Plan II projects or 125 percent (125%) of rent in Plan I projects) for the period of my absence exceeding sixty (60) consecutive days. Tenant also understands that, should any rental assistance be suspended or reassigned to other eligible tenants, Tenant is not assured that such assistance will be available upon Tenant's return. Tenant also understands that if Tenant's absence continues, Landlord may take the appropriate steps to terminate this Lease Agreement and the right of Tenant to occupy the Leased Premises.

**SECTION NINE (GENERAL)**

Landlord and Tenant agree that this Lease Agreement constitutes the entire agreement of Landlord and Tenant, all prior negotiations and discussions being merged herein, no oral agreements having been made by Landlord (or any agent of Landlord) and Tenant. Each person listed herein as a Tenant is jointly and severally liable for each provision of this Lease Agreement and notice by Landlord to any person listed herein as a Tenant constitutes notice to the Tenant. Only the persons listed on this Lease Agreement may reside in the Leased Premises.

The undersigned mutually agree to abide by all provisions and conditions as set forth on both sides of this Lease Agreement.

IN WITNESS WHEREOF, this Lease Agreement is executed in duplicate by the parties hereto this __ day of ____, 20__

ALL ADULT OCCUPANTS MUST SIGN:

Tenant: X

Tenant: ________

EXHIBIT 1

resulting net monthly contribution will be $ 810 . If tenant's net monthly contribution would be less than zero, Landlord will pay to Tenant the sum of $ 1004

Tenant also understands and agrees that Tenant's monthly contribution under this Lease Agreement may be raised or lowered, based on changes in the household income or adjustments to income, failure to submit information necessary to certify income, changes in the household composition or number, age, student or disability status of persons living in the household, and on the escalation clause in this Lease Agreement. Should Tenant no longer receive rental assistance as a result of these changes, or the rental assistance agreement executed by the owner and RD expires, Tenant understands and agrees that Tenant's monthly contribution may be adjusted to no less than $ 810 (basic) nor more than $ 1004 (note rate) during the Term of this Lease Agreement, except that, based on the escalation clause in this Lease Agreement, these rates may be changed by a rent or occupancy charge change approved by RD.

Tenant understands that reasonable effort will be made to provide rental assistance so long as Tenant remains eligible and the rental assistance agreement between Landlord and RD remains in effect. However, should this assistance be terminated, Tenant may arrange to terminate this Lease Agreement, giving proper notice as set forth elsewhere in this Lease Agreement.

**SECTION FIVE (TENANT UTILITIES)**

Landlord agrees to pay for the following utilities (if checked):

Electricity ______ Gas ______ Water ✓ Sewer ✓ Garbage Removal ✓

All utilities shall be used for ordinary household purposes only. It is the Tenant's responsibility to pay utility charges promptly when due. Failure by the Tenant to have utilities connected at any time during the Term of this Lease Agreement shall constitute a breach of this Lease Agreement entitling Landlord to all remedies set forth in Section Fifteen of this Lease Agreement. By signing this Lease Agreement, the Tenant gives permission for the Landlord to obtain utility cost information on Tenant's apartment from all utility companies in order to calculate an accurate Utility Allowance as required by RD.

**SECTION SIX (SECURITY DEPOSIT)**

Tenant shall pay to Landlord a security deposit (the "Security Deposit") of $ 250 , which will be held as security for Tenant to fulfill obligations as outlined in this Lease Agreement along with any additional sums paid by Tenant to Landlord pursuant to a separate Security Deposit Agreement/ Addendum executed between the parties, which will become an attachment to this Lease Agreement.

this Lease Agreement.

**IN WITNESS WHEREOF,** this Lease Agreement is executed in duplicate by the parties hereto this _____ day of __________, 20___.

ALL ADULT OCCUPANTS MUST SIGN:

Tenant: X ______________________________

Tenant ______________________________

By Linda Cook ______________ Landlord

**"THIS LEASE IS SUBJECT TO THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AGREEMENT."**

**SECTION TEN (OTHER LEASE PROVISIONS)**

The following documents/forms are a part of this Lease Agreement and are attached hereto: Project Rules and Regulations (Occupancy Rules), Form RD 3560-8 (Tenant Certification) or HUD Form 50059 or other HUD-approved form if Tenant receives HUD Section 8 subsidy, any project Security Deposit Agreement/Addendum, RD Form 3560.7 (Multiple Family Housing Project Budget/Utility Allowance), any Leased Premises condition inspection forms completed at initial occupancy and upon Tenant vacating the Leased Premises, Pet Policy/Agreement if pets are allowed at the Leased Premises, and any RD-approved Project Occupancy Standard/Policy. By execution of this Lease Agreement, Tenant acknowledges receipt of the above completed documents/forms.

Nothing in the Lease Agreement shall be construed as waiving any of the Landlord's or Tenant's rights under the laws of the State of Arkansas. In the event that the Landlord employs an attorney to enforce the provisions of this Lease Agreement, the Tenant agrees to pay reasonable attorney's fees and expenses, including litigation expenses incurred by Landlord if Landlord is the prevailing party.

**SECTION ELEVEN (ESCALATION CLAUSE)**

Changes in GTC (rental rates), basic and/or note rate rents, or occupancy charges may occur during the Term of this Lease Agreement prior to its termination if the RD approves a change in monthly rental rates or utility allowances; or there is a change in household income, composition, or adjustments. Any rent changes, utility allowance changes, contribution changes, or notice of ineligibility shall become effective according to HB-2-3560.

**SECTION TWELVE (ELIGIBILITY, INCOME CERTIFICATIONS, RENTS)**

Tenant acknowledges that eligibility for occupancy in the Apartment Complex will be determined according to applicable RD/HUD regulations, and the following RD-approved documents: Management Plan; any project Tenant Selection Plan or Admission and Leasing/Occupancy policies; and any project Occupancy Standards regarding appropriate dwelling unit size. Prior to initial eligibility determination and annually thereafter, the Applicant/Tenant must provide information and authorizations that will permit the Landlord to determine Applicant's/Tenant's eligibility and/or continued eligibility to live in the Apartment Complex. Examples of (but not limited to) information which the Applicant/Tenant will supply to permit such eligibility determinations are as follows: income verification, names and ages of household members; in congregate facilities, only that essential information about the person's request for provided service(s) to determine whether the Apartment Complex provides the services requested by the Applicant/Tenant and/or to determine how to best serve the Applicant's/Tenant's request with reasonable accommodation, referral services, etc. In case of a group home, the information may also include an assessment by a professional medical examiner or practitioner, social service caseworker representative of an advocacy group, member of the clergy, etc., that the Applicant/Tenant provides to support the application or recertification for housing and services.

In addition to the initial eligibility determination, eligibility will be redetermined annually and may be redetermined due to changes in household income or composition. Tenant must provide any information requested by Landlord in order to comply with RD/HUD regulations pertaining to eligibility determination. Tenant will be responsible for reporting to Landlord any changes in household income, composition, or adjustments. Refusal to provide any information requested by Landlord for eligibility determinations, refusal to execute a new Lease Agreement and/or Form RD 3560-8 (Tenant Certification) or HUD Form 50059 that is a result of a redetermination of eligibility, refusal to report changes in household income, composition, or adjustments, or any omission or misstatement by Tenant of information needed for eligibility determination, or on the application, shall constitute a breach of this Lease Agreement and provide Landlord the option to terminate this Lease Agreement.

Rental rates or occupancy charge and appropriate dwelling unit size will be based on Form RD 3560-8 (Tenant Certification), RD Form 3560.7, (Multiple Family Housing Project Budget/Utility Allowance), and the RD-approved project Occupancy Standards/ Policies.

Tenant may request a redetermination of GTC should any of the original determining information change or if he/she believes any determining information or calculations or incorrect.

**SECTION THIRTEEN (MAINTENANCE AND IMPROVEMENTS)**

Tenant shall keep the Leased Premises in safe and sanitary condition and in compliance with all state, federal, municipal, county or other laws, regulations, ordinances or directives, and upon expiration of the Term, extension thereof, or earlier termination of this Lease Agreement, shall deliver the Leased Premises in good order and condition as the same now are, reasonable wear and tear excepted. Tenant agrees not to make alterations, repairs, additions or improvements to the Leased Premises without the prior written consent of Landlord, and that any such alterations, repairs, additions or improvements, whether made by Landlord or Tenant, shall become a part of the Leased Premises and so remain upon expiration of the Term, extension thereof, or earlier termination of this Lease Agreement. Tenant shall not affix any antenna or satellite dish to the exterior of the Leased Premises or Apartment Complex, solely except as Landlord may be required to allow by applicable laws and regulations in existence from time to time. Tenant is responsible for all damages to furnishings or the Leased Premises caused by negligence, personally or by an invitee or agent. All charges for maintenance, repairs, and damage are due when billed and are to be paid within five (5) days from date of billing. Landlord shall maintain the buildings and common areas in the Apartment Complex in accordance with applicable housing codes and RD Regulations. Notwithstanding any provision of this Lease Agreement to the contrary, Tenant is responsible for the safety of persons and property in and about the Leased Premises and common areas adjacent thereto and is authorized by Landlord to take precautionary steps to accomplish the responsibility of Tenant expressed in this Section Thirteen.

Tenant is responsible for promptly notifying Landlord (in the manner required by Section Fifteen) in writing of any alleged defective or potentially harmful condition existing within or about the Leased Premises, including without limitation water leaks, seepage, steam, rust, mold, "secondhand" tobacco residue or smoke (in "non-smoking units only), mildew, fungus, spores, wet rot or dry rot, electrical problems, malfunctioning lights, broken or missing locks or latches (if supplied by Landlord), and all needed maintenance or repairs (collectively, the "Defects"). Landlord shall have the right to disconnect utilities, relocate Tenant and take any other reasonable steps necessary to make repairs to the Leased Premises and, upon completion of such repairs, Tenant shall reoccupy the Leased Premises. Should Tenant reasonably and legitimately determine any condition of the Leased Premises, except as caused by Tenant, to be dangerous or hazardous to the lawful occupants of the Leased Premises, after written notice to Landlord (in the manner required by Section Fifteen) and expiration of a reasonable amount of time for Landlord to cure the alleged Defects, to the extent hazardous to persons, Tenant may terminate this Lease Agreement and, if all conditions of Section Six are complied with by Tenant, receive a return of the Security Deposit.

**SECTION FOURTEEN (USE, RIGHT TO ENTER)**

The Leased Premises shall be used as a dwelling only and for no unlawful purposes. Tenant agrees to conduct himself/herself and to require others on the Leased Premises with his/her consent to conduct themselves in a manner that is not offensive, noisy, dangerous or otherwise disturbing to other tenants' peaceful enjoyment of the common areas and other rental units in the Apartment Complex. Tenant acknowledges that, should any nuisance abatement or similar proceeding be commenced or threatened against Landlord, Tenant, the Leased Premises or Apartment Complex by any municipal, county, state or federal nuisance abatement or enforcement entity, wholly or partially resulting from the action (or inaction) of Tenant (and guests of Tenant solely as allowed by this Lease Agreement) in, on or about the Leased Premises or Apartment Complex, such action or inaction shall constitute a material breach of this Lease Agreement by Tenant entitling Landlord to all available remedies set forth in this Lease Agreement or by applicable laws.

Landlord reserves the right to enter the Leased Premises at reasonable times without advance notice (1) to inspect the Leased Premises to assure compliance with the terms of this Lease Agreement, (2) to show the Leased Premises to prospective tenants after notice to vacate has been given tenant, and (3) to perform maintenance, make repairs, for pest extermination and for other purposes deemed reasonable by Landlord. Landlord may enter the unit at any time in the event of an emergency. If Tenant refuses to allow access as provided by this paragraph, Landlord may terminate this Lease Agreement and seek all remedies provided by this Lease Agreement or applicable law.

**SECTION FIFTEEN (NOTICE AND TERMINATION)**

Landlord may terminate this Lease Agreement for breach of any term of this Lease Agreement, giving Tenant three (3) days' notice to vacate in writing. Tenant may terminate this Lease Agreement as set forth in Section Thirteen or by providing Landlord thirty (30) days' notice of an alleged default of this Lease Agreement by Landlord, unless Landlord disputes the existence of default, or cures the default prior to expiration of the thirty (30) day period.

Notice to Landlord shall be considered properly served by sending a letter by first-class mail (certified, return receipt requested), properly stamped and addressed, to Landlord at either the management office on the property or the address to which rental payments are mailed or delivered.

The Landlord and or Management of the Apartment Complex in which you reside may, without obligation to do so, from time to time take certain action(s) designed to increase known security measures. Tenant understands, acknowledges and agrees that such action(s) do(es) not, in any way, constitute an assumption by Landlord and or Management of any duty to keep persons or property in and around the Apartment Complex safe from intentional misconduct or criminal conduct, and that Landlord and or Management does not have and disclaims responsibility to protect persons and property in and around the Apartment Complex.

**SECTION SEVENTEEN (FIRE AND CASUALTY)**

If, during the Term of this Lease Agreement, the Leased Premises become damaged by fire or other casualty so as to render the Leased Premises uninhabitable and the time necessary to repair such damage shall not reasonably exceed thirty (30) days from the date of such casualty, Landlord shall make such repairs and Tenant shall resume occupancy of the Leased Premises upon their completion. If the time necessary to repair damages to the Leased Premises caused by any casualty shall exceed thirty (30) days, Landlord may terminate the Lease Agreement on ten (10) days' notice to Tenant.

If the fire or other casualty was not caused by the negligence or willful act of Tenant or his/her employees, family members, agents or visitors, all rental payments due hereunder shall be abated from the date of such casualty to the date of the completion of repairs, calculated on a pro-rata basis. Any unearned rents paid in advance by Tenant shall be refunded or credited to Tenant.

If the fire or other casualty was due to the negligence or willful act of Tenant or his/her employees, family members, agents or visitors, monthly rental payments due hereunder shall not be abated and all expenses of repairing the damage caused by such fire or casualty shall be the responsibility of Tenant and shall be due as set forth in Section Thirteen of this Lease Agreement.

Landlord discloses to Tenant and Tenant agrees and acknowledges that, in the event of a fire or other casualty, Landlord shall not have responsibility for any personal property or fixtures of Tenant within the Leased Premises or the Apartment Complex. Therefore, Landlord strongly recommends and urges Tenant to obtain and maintain insurance on all of Tenant's personal property and fixtures. Tenant is solely responsible for obtaining and paying for any insurance coverage desired by Tenant for the personal property, contents and other property owned by Tenant and located on or about the Leased Premises or the Apartment Complex.

**SECTION EIGHTEEN (RD REQUIRED CLAUSES)**

1. I understand that I will no longer be eligible for occupancy in both the Apartment Complex and the Leased Premises if my income exceeds the maximum allowable adjusted income as defined periodically by RD for Arkansas.
2. I understand that, should I receive occupancy benefits to which I am not entitled due to my/our failure to provide information or due to incorrect information provided by me or on my behalf by others, or for any other household member, I may be required to make restitution and I agree to repay any amount of benefits to which I was not entitled.
3. I understand that income certification is a requirement of occupancy and I agree to promptly provide any certifications and income verifications required by the owner to permit determination of eligibility and, when applicable, the monthly tenant contribution to be charged.
4. Should I no longer meet the occupancy eligibility requirements of the Apartment Complex and should the Leased Premises become overcrowded or under utilized or should I no longer meet the eligibility requirements of the Apartment Complex during the term of this Lease Agreement, I will be required to vacate the Leased Premises at the end of the Lease Term unless eligibility can be established following specified steps, such as moving to an appropriate size unit, or an exception is granted by Landlord. Tenant agrees to move to a unit of appropriate size if Tenant's household size changes.
5. I agree to notify the Landlord of any planned absence of two (2) weeks or more.
6. I agree not to assign this Lease Agreement, or sublet the Leased Premises or any part thereof.
7. I will be permitted to have a guest(s) visit my household. However, Landlord reserves the right to request a recorded declaration of domicile or proof of domicile if it is suspected that the guest is an unauthorized household occupant. Such suspicion may arise whenever an adult person(s) is making reoccurring visits or one continuous visit of 14 days and/or nights in a 45-day period without prior notification to and written consent of the management. Should I or my guest(s) not provide the requested information needed to confirm other domicile, or should the facts be sufficient to evidence domicile in the project, the Landlord will consider such person(s) a member of the Tenant's household and may enforce any covenants in this Lease Agreement shown to be broken and/or require recertification.
8. I understand that, should the Apartment Complex be sold to a buyer approved by RD, this Lease Agreement will be transferred to the new owner.
9. The Apartment Complex is financed by RD and is subject to nondiscrimination provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975, and the Americans with Disabilities Act and complaints may be directed to the Administrator, USDA Rural Development, Washington, D.C. 20250. Complaints of Fair Housing violations may be sent directly to the Secretary of Housing and Urban Development, Washington, D.C. 20410. Any tenant grievance or appeal from Landlord's decision shall be resolved in accordance with procedures consistent with RD regulations covering such procedures which are posted in the rental office or otherwise in the Apartment Complex.
10. I understand that, during the term of this Lease Agreement, no increase in my gross monthly tenant contribution shall take place due to the prepayment of the RD loan which is secured by the Apartment Complex during the Term of this Lease Agreement.
11. I understand that, should any Federal subsidies paid to the Landlord on my behalf be suspended or canceled, due to a monetary or nonmonetary default by Landlord, the monetary payment made by me to Landlord (or when applicable, the monetary payment received by me from Landlord) shall not change over that which would have been required had the subsidy remained in place.
12. It is understood that the use, attempted use, or possession, manufacture, sale, or distribution of an illegal controlled substance (as defined by local, State, or Federal law) while in or on any part of the Apartment Complex is an illegal act. It is further understood that such action is a material violation of this Lease Agreement. Such violations (hereinafter called a "drug violation[s]") may be evidenced upon the admission to or conviction of a drug violation. It is further understood that domestic violence will not be tolerated on Rural Housing properties, and that such action is a material lease violation. All perpetrators will be evicted, while the victim and other household occupants may remain in the unit in accordance with eligibility requirements. The Landlord may require any Tenant or other adult member of the tenant household occupying the Leased Premises (or other adult or nonadult person outside the Tenant's household who is using the Leased Premises) who commits a drug violation or domestic violence to vacate the Leased Premises permanently, within time frames set by the Landlord, and not thereafter enter upon the Apartment Complex or the Leased Premises without the Landlord's prior consent as a condition for continued occupancy by members of the Tenant's household. The Landlord may deny consent for entry unless the person agrees to not commit any drug violations or domestic violence in the future and is either actively participating in a counseling or

and seek all remedies provided by this Lease Agreement or applicable law.

**SECTION FIFTEEN (NOTICE AND TERMINATION)**

Landlord may terminate this Lease Agreement for breach of any term of this Lease Agreement, giving Tenant three (3) days' notice to vacate in writing. Tenant may terminate this Lease Agreement as set forth in Section Thirteen or by providing Landlord thirty (30) days' notice of an alleged default of this Lease Agreement by Landlord, unless Landlord disputes the existence of default, or cures the default prior to expiration of the thirty (30) day period.

Notice to Landlord shall be considered properly served by sending a letter by first-class mail (certified, return receipt requested), properly stamped and addressed, to Landlord at either the management office on the property or the address to which rental payments are mailed or delivered.

Notice to Tenant shall be considered properly served by (a) sending a letter by first-class mail to the Tenant at his or her address at the Leased Premises, or (b) by serving a copy of the notice on any adult person answering the door at the leased dwelling unit, or, if no adult person responds, by placing the notice under or through the door, if possible, or else by affixing the notice to the door.

Tenant may terminate this Lease Agreement prior to expiration of the Term for "good cause" such as moving to another location for employment, loss of job, severe illness, or death of spouse or after thirty (30) days' notification by Landlord of intent to prepay.

Tenant shall be deemed as occupying the Leased Premises and bound by this Lease Agreement for as long as any of the Tenant's personal property remains in the Leased Premises after the Tenant has ceased occupancy with the intent to vacate and leave the Leased Premises, until such time the personal possessions have been removed voluntarily or by legal means, subject to the provision of State or local law.

**SECTION SIXTEEN (TENANT ABANDONMENT, LIABILITY)**

Upon voluntary or involuntary termination of this Lease Agreement, all property left in or about the Leased Premises by the Tenant will be considered abandoned and will be disposed of by the Landlord as the Landlord shall see fit without notice to or recourse by the Tenant.

Landlord or his representative or agents shall not be liable to any tenant, occupant, visitor or guest for any personal injury, damage or loss of personal property (furniture, jewelry, clothing, etc.) which occurs in or about the common areas, buildings or other portions of the Apartment Complex by the action or inaction of other tenants or persons (including without limitations theft, burglary, assault, vandalism, or other criminal conduct by any person), fire, flood, water leaks, rain, hail, ice, snow, explosions, interruption of utilities, act of God or other causes.

this Lease Agreement. Such violations (hereinafter called a "drug violation") may be evidenced upon the admission to or conviction of a drug violation. It is further understood that domestic violence will not be tolerated on Rural Housing properties, and that such action is a material lease violation. All perpetrators will be evicted, while the victim and other household occupants may remain in the unit in accordance with eligibility requirements. The Landlord may require any Tenant or other adult member of the tenant household occupying the Leased Premises (or other adult or nonadult person outside the Tenant's household who is using the Leased Premises) who commits a drug violation or domestic violence to vacate the Leased Premises permanently, within time frames set by the Landlord, and not thereafter enter upon the Apartment Complex or the Leased Premises without the Landlord's prior consent as a condition for continued occupancy by members of the Tenant's household. The Landlord may deny consent for entry unless the person agrees to not commit any drug violations or domestic violence in the future and is either actively participating in a counseling or recovery program, complying with court orders related to a drug violation, or has completed a counseling or recovery program.

The Landlord may require any Tenant to show evidence that any nonadult member of the Tenant household occupying the Leased Premises, who committed a drug violation, agrees to not commit a drug violation in the future, and to show evidence that the person is either actively seeking or receiving assistance through a counseling or recovery program, complying with court orders related to a drug violation, has completed a counseling or recovery program within timeframes specified by the Landlord as a condition for continued occupancy in the Leased Premises. Should a further drug violation be committed by any nonadult person occupying the Leased Premises, the Landlord may require the person to be severed from tenancy as a condition for continued occupancy of the Leased Premises by the Tenant.

If a person vacating the Leased Premises, as a result of the above policies, is one of the Tenants, the person shall be severed from the tenancy and this Lease Agreement shall continue among any other remaining Tenants and the Landlord. The Landlord may also, at the option of the Landlord, permit another adult member of the household to be a Tenant.

Should any of the above provisions governing a drug violation be found to violate any of the laws of the land, the remaining enforceable provisions shall remain in effect. The provisions set out above do not supplant any rights of tenants afforded by law.

©2005 RRHA of ARK. (RD approved July 21, 2005)

# AFFORDABLE HOUSING ASSOCIATION OF ARKANSAS, INC. LEASE AGREEMENT

LANDLORD: Interwest Corp.

APARTMENT COMPLEX: Paragould Apts

(Landlord's Address) 219 Bogie Rd City Paragould State Ar Zip 72450

TENANT(S) Kimberly Stokes

OTHER OCCUPANT(S) OF APARTMENT ______

LEASED PREMISES (Unit) Apartment # 12, a 2 bedroom apartment located at 219 Bogie Rd. Paragould Arkansas 72450 RENTAL RATE/MO. 185.00

**SECTION ONE (LEASE TERM)**

The term of this Lease Agreement (the "Term") shall be for one (1) year, commencing on Nov. 1, 2025 and ending on Oct 31, 2026 unless sooner terminated by either party in accordance with the provisions of this Lease Agreement. If Landlord and Tenant enter into a new lease agreement at the end of the Term, thereafter this Lease Agreement shall no longer be effective. If Tenant is allowed to occupy the Leased Premises (defined below) after the end of the Term and without signing a new lease agreement, such occupancy shall be exclusively on a month-to-month basis, terminable by Landlord or Tenant upon one (1) month's notice (or sooner if allowed by Sections Three, Fifteen and Seventeen of this Lease Agreement). In consideration of the mutual agreements and covenants of Landlord and Tenant set forth in this Lease Agreement, Landlord hereby leases to Tenant(s) and Tenant(s) hereby leases from Landlord for use in accordance with Section Fourteen, the Leased Premises, together with the fixtures and accessories belonging thereto, for the Term. All parties listed above as Landlord and Tenant(s) are herein referred to individually and collectively as Landlord and Tenant, respectively.

**SECTION TWO (AGENCY DISCLOSURE) (CHECK ONE)**

☐ The Apartment Complex is not managed by a Real Estate Licensee and agency disclosure is not required.

☒ The Apartment Complex is managed by a Real Estate Licensee/Managing Agent and agency disclosure is required. Tenant has read and signed the following statement prior to entry into and execution of this Lease Agreement:

"I understand that the Managing Agent/Real Estate Licensee is acting solely as agent for the Landlord and that this fact was disclosed to me prior to any confidential information being provided to the agent for Landlord."

X Tenant: Kimberly Stokes

Tenant: ______

**SECTION THREE (RENTAL)**

All rents are due and payable monthly in advance either at the Landlord's office in the Apartment Complex, or at a different address provided to Tenant by Landlord in writing, on or before the FIRST DAY OF EACH CALENDAR MONTH without necessity of demand by Landlord. In addition to any rent due, a late payment penalty of the greater of Ten Dollars ($10.00) or an amount equal to five percent (5%) of the Tenant's gross tenant contribution (as described at line 31 of USDA Rural Development (hereinafter "RD") (RD being formerly known as Farmers Home Administration, or FmHA) Form 3560-8 and Section Four of this Lease Agreement) (the "GTC") will be collected for any rent paid after the 5th (___) of the month. All payments, whether for rental obligations, security deposit, application fee, late charges, or any other financial obligations, from Tenant to Landlord, shall be paid by check or money order. All checks, money orders and the like shall be made payable to Landlord. Tenant agrees to pay a charge of $ 10.00 to cover the cost of handling and collection of any check returned by a bank due to insufficient funds, closed account or for any other reason. Landlord agrees to accept rental payments without regard to any other charges owed by Tenant to Landlord and to seek separate legal remedy for the collection of any other charges which may accrue to Landlord from Tenant(s) and acceptance of any such rental payment shall not be deemed a waiver by Landlord of any default by Tenant or the right to collect any other charges owed by Tenant. The acceptance of partial payments by Landlord for any month or months shall not constitute a waiver by Landlord that the monthly rent is due in full on or before the first (1st) day of the month. If Tenant has not paid current month's rent within 5 (___) days after due date, Landlord shall have the option to terminate this Lease Agreement and take possession of the Leased Premises upon giving three (3) days' written notice to Tenant of such nonpayment and Landlord's termination of this Lease Agreement.

**SECTION FOUR (CHECK ONE)**

☐ BASIC RENT: Tenant understands and agrees that the GTC, as determined on the latest Form RD 3560-8, which must be attached to this Lease Agreement, for rent or occupancy charge and utilities, will be $ 855. If Tenant pays any or all utilities directly (not including telephone or cable TV), a utility allowance of $ 98 will be deducted from Tenant's gross monthly rent or occupancy charge, except that Tenant will not pay less than the basic rent nor more than the note rate rent or occupancy charge stated below. Tenant's net monthly rent or occupancy charge will be $ 1101. Tenant also understands and agrees that Tenant's monthly tenant rent or occupancy charge under this Lease Agreement may be raised or lowered, based on changes in the household composition, number, age, student or disability status of persons living in the Leased Premises, and on the escalation clause in this Lease Agreement. Tenant's rent or occupancy charge will not, however, be less than $ 855 (basic) nor more than $ 1101 (note rate) during the Term of this Lease Agreement, except that, based on the escalation clause in this Lease Agreement, these rental rates or occupancy charges may be changed by a rent or occupancy charge change approved by RD.

☒ RENTAL ASSISTANCE: Tenant understands and agrees that, as long as Tenant receives rental assistance, Tenant's gross monthly contribution (as determined on the latest Form RD 3560-8) (which must be attached to this Lease Agreement) for rent or occupancy charge and utilities will be $ 98. If Tenant pays any or all utilities directly (not including telephone or cable TV), a utility allowance of $ 98 will be deducted from Tenant's gross monthly contribution and Tenant's resulting net monthly contribution will be $ 98. If Tenant's net monthly contribution would be less than zero, Landlord will pay to Tenant the sum of $ 98.00

Tenant also understands and agrees that Tenant's monthly contribution under this Lease Agreement may be raised or lowered, based on changes in the household income or adjustments to income, failure to submit information necessary to certify income, changes in the household composition or number, age, student or disability status of persons living in the household, and on the escalation clause in this Lease Agreement. Should Tenant no longer receive rental assistance as a result of these changes, or the rental assistance agreement executed by the owner and RD expires, Tenant understands and agrees that Tenant's monthly contribution may be adjusted to no less than

The Security Deposit will be held without interest and may be deposited in a bank account with other tenants' security deposits, or may be held by Landlord and not in the trust account of any Real Estate Licensee who may manage the Apartment Complex. The Security Deposit is not advance rent and cannot be applied to rent by Tenant unless Tenant defaults under this Lease Agreement and Landlord elects to terminate this Lease Agreement, upon such event Landlord may so apply the Security Deposit without waiving any right against the Tenant provided by this Lease Agreement or applicable law. Following termination and delivery of possession of the Leased Premises to Landlord, the Security Deposit will be delivered to Tenant at any forwarding address provided by Tenant to Landlord in writing, otherwise to the last address of Tenant actually known to Landlord, only after all of the following conditions have been met.

1. The Term of this Lease Agreement must have expired or terminated without default by Tenant.
2. Thirty (30) days' written notice must have been properly given to Landlord prior to vacating the Leased Premises.
3. The Leased Premises have been cleaned thoroughly (including the carpet) and no damage beyond normal wear and tear is present in or about the Leased Premises.
4. If additional cleaning or other work is required to repair damages to the Leased Premises, appropriate charges will be withheld from the Security Deposit to accomplish the necessary cleaning or repairs. To determine the Tenant's obligation for such additional cleaning and/or repairs, Landlord shall be responsible for providing Tenant with a written statement of the condition of the Leased Premises, both at initial occupancy and when Tenant vacates the Leased Premises. Tenant may and is encouraged to be present at both inspections.

**SECTION SEVEN (ACCESSIBLE UNITS)**

☐ The Leased Premises is not an accessible unit specially designed for persons with disabilities.

☐ The Leased Premises are believed by Landlord to be an accessible unit, specially designed for persons disabilities and the Tenant household has a person with a disability.

☐ The Leased Premises are believed by Landlord to be an accessible unit, specially designed persons disabilities and the Tenant does not have a person with a disability in the household. Tenant understands and agrees with the following statement: "I acknowledge that I am occupying a designated accessible unit. I acknowledge that priority for such units is given to those needing special physical design features. I acknowledge that I am permitted to occupy the Leased Premises until Landlord issues a notice that a priority applicant is on the waiting list and that I must move to another suitably sized vacant unit in the Apartment Complex. Upon receiving such notice, I agree to move, at my own expense, within thirty (30) calendar days to another vacant unit in the Apartment Complex if one is available. I further understand that my rental rate will change, when appropriate, to the rental rate for the unit I move to and this Lease Agreement will be modified accordingly."

**SECTION EIGHT (REPORTING CHANGES/EXTENDED ABSENCES)**

1. Tenant agrees to immediately notify the Landlord when there is a change in the Tenant's gross income or adjusted income, or when there is a change in the household composition, number, age, student or disability status of persons living in the Leased Premises. Tenant understands that rent or benefits may be affected as a result of this information. Tenant also understands that failure to report such changes may result in loss of benefits to which Tenant may be entitled or may result in the Landlord taking corrective action if benefits were mistakenly received. Tenant understands that the corrective action the Landlord may take includes the initiation of a demand for repayment of any benefits or rental subsidies improperly received, initiation of a notice to cancel any rental assistance from RD or HUD Section 8 assistance being received for the balance of Tenant's certification period, initiation of a notice to increase monthly rent to $______ per month (note rate rent for Plan II projects or 125 percent (125%) of rent in Plan I projects), or initiation of a notice of termination. Tenant understands and agrees that one or more of these remedies may be initiated at the option of the Landlord.
2. Tenant understands that Tenant must promptly notify the Landlord of any extended absences and that if Tenant does not personally reside in the Leased Premises for a period exceeding sixty (60) consecutive days, for reason other than health or emergency, the net tenant contribution shall be raised to $______ per month (note rate rent for Plan II projects or 125 percent (125%) of rent in Plan I projects) for the period of my absence exceeding sixty (60) consecutive days. Tenant also understands that, should any rental assistance be suspended or reassigned to other eligible tenants, Tenant is not assured that such assistance will be available upon Tenant's return. Tenant also understands that if Tenant's absence continues, Landlord may take the appropriate steps to terminate this Lease Agreement and the right of Tenant to occupy the Leased Premises.

**SECTION NINE (GENERAL)**

Landlord and Tenant agree that this Lease Agreement constitutes the entire agreement of Landlord and Tenant, all prior negotiations and discussions being merged herein, no oral agreements having been made by Landlord (or any agent of Landlord) and Tenant. Each person listed herein as a Tenant is jointly and severally liable for each provision of this Lease Agreement and notice by Landlord to any person listed herein as a Tenant constitutes notice to the Tenant. Only the persons listed on this Lease Agreement may reside in the Leased Premises.

The undersigned mutually agree to abide by all provisions and conditions as set forth on both sides of this Lease Agreement.

**IN WITNESS WHEREOF**, this Lease Agreement is executed in duplicate by the parties hereto this ____ day of ______, 20__

ALL ADULT OCCUPANTS MUST SIGN

X Tenant: Kimberly Stokes

Tenant: ______

EXHIBIT 2

tabbies

[illegible] less than zero, Landlord will pay to Tenant the sum of $______.

Tenant also understands and agrees that Tenant's monthly contribution under this Lease Agreement may be raised or lowered, based on changes in the household income or adjustments to income, failure to submit information necessary to certify income, changes in the household composition or number, age, student or disability status of persons living in the household, and on the escalation clause in this Lease Agreement. Should Tenant no longer receive rental assistance as a result of these changes, or the rental assistance agreement executed by the owner and RD expires, Tenant understands and agrees that Tenant's monthly contribution may be adjusted to no less than $ 865 (basic) nor more than $ 1101 (note rate) during the Term of this Lease Agreement, except that, based on the escalation clause in this Lease Agreement, these rates may be changed by a rent or occupancy charge change approved by RD.

Tenant understands that reasonable effort will be made to provide rental assistance so long as Tenant remains eligible and the rental assistance agreement between Landlord and RD remains in effect. However, should this assistance be terminated, Tenant may arrange to terminate this Lease Agreement, giving proper notice as set forth elsewhere in this Lease Agreement.

**SECTION FIVE (TENANT UTILITIES)**

Landlord agrees to pay for the following utilities (if checked):

Electricity ______ Gas ______ Water ✓ Sewer ✓ Garbage Removal ✓

All utilities shall be used for ordinary household purposes only. It is the Tenant's responsibility to pay utility charges promptly when due. Failure by the Tenant to have utilities connected at any time during the Term of this Lease Agreement shall constitute a breach of this Lease Agreement entitling Landlord to all remedies set forth in Section Fifteen of this Lease Agreement. By signing this Lease Agreement, the Tenant gives permission for the Landlord to obtain utility cost information on Tenant's apartment from all utility companies in order to calculate an accurate Utility Allowance as required by RD.

**SECTION SIX (SECURITY DEPOSIT)**

Tenant shall pay to Landlord a security deposit (the "Security Deposit") of $__________ which will be held as security for Tenant to fulfill obligations as outlined in this Lease Agreement along with any additional sums paid by Tenant to Landlord pursuant to a separate Security Deposit Agreement/Addendum executed between the parties, which will become an attachment to this Lease Agreement.

AHA-003 Rev. 10/08

this Lease Agreement.

**IN WITNESS WHEREOF,** this Lease Agreement is executed in duplicate by the parties hereto this _____ day of __________, 20___.

ALL ADULT OCCUPANTS MUST SIGN:

Tenant: X Kimberly Stokes

Tenant: ______________________

By: Linda Cook ______________ Landlord

**"THIS LEASE IS SUBJECT TO THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AGREEMENT."**

**SECTION TEN (OTHER LEASE PROVISIONS)**

The following documents/forms are a part of this Lease Agreement and are attached hereto: Project Rules and Regulations (Occupancy Rules), Form RD 3560-8 (Tenant Certification) or HUD Form 50059 or other HUD-approved form if Tenant receives HUD Section 8 subsidy, any project Security Deposit Agreement/Addendum, RD Form 3560-7 (Multiple Family Housing Project Budget/Utility Allowance), any Leased Premises condition inspection forms completed at initial occupancy and upon Tenant vacating the Leased Premises, Pet Policy/Agreement if pets are allowed at the Leased Premises, and any RD-approved Project Occupancy Standard/Policy. By execution of this Lease Agreement, Tenant acknowledges receipt of the above completed documents/forms.

Nothing in the Lease Agreement shall be construed as waiving any of the Landlord's or Tenant's rights under the laws of the State of Arkansas. In the event that the Landlord employs an attorney to enforce the provisions of this Lease Agreement, the Tenant agrees to pay reasonable attorney's fees and expenses, including litigation expenses incurred by Landlord if Landlord is the prevailing party.

**SECTION ELEVEN (ESCALATION CLAUSE)**

Changes in GTC (rental rates), basic and/or note rate rents, or occupancy charges may occur during the Term of this Lease Agreement prior to its termination if the RD approves a change in monthly rental rates or utility allowances, or there is a change in household income, composition, or adjustments. Any rent changes, utility allowance changes, contribution changes, or notice of ineligibility shall become effective according to HB-2-3560.

**SECTION TWELVE (ELIGIBILITY, INCOME CERTIFICATIONS, RENTS)**

Tenant acknowledges that eligibility for occupancy in the Apartment Complex will be determined according to applicable RD/HUD regulations, and the following RD-approved documents: Management Plan; any project Tenant Selection Plan or Admission and Leasing/Occupancy policies, and any project Occupancy Standards regarding appropriate dwelling unit size. Prior to initial eligibility determination and annually thereafter, the Applicant/Tenant must provide information and authorizations that will permit the Landlord to determine Applicant's/Tenant's eligibility and/or continued eligibility to live in the Apartment Complex. Examples of (but not limited to) information which the Applicant/Tenant will supply to permit such eligibility determinations are as follows: income verification, names and ages of household members, in congregate facilities, only that essential information about the person's request for provided service(s) to determine whether the Apartment Complex provides the services requested by the Applicant/Tenant and/or to determine how to best serve the Applicant's/Tenant's request with reasonable accommodation, referral services, etc. In case of a group home, the information may also include an assessment by a professional medical examiner or practitioner, social service caseworker, representative of an advocacy group, member of the clergy, etc., that the Applicant/Tenant provides to support the application or recertification for housing and services.

In addition to the initial eligibility determination, eligibility will be redetermined annually and may be redetermined due to changes in household income or composition. Tenant must provide any information requested by Landlord in order to comply with RD/HUD regulations pertaining to eligibility determination. Tenant will be responsible for reporting to Landlord any changes in household income, composition, or adjustments. Refusal to provide any information requested by Landlord for eligibility determinations, refusal to execute a new Lease Agreement and/or Form RD 3560-8 (Tenant Certification) or HUD Form 50059 that is a result of a redetermination of eligibility, refusal to report changes in household income, composition, or adjustments, or any omission or misstatement by Tenant of information needed for eligibility determination, or on the application, shall constitute a breach of this Lease Agreement and provide Landlord the option to terminate this Lease Agreement.

Rental rates or occupancy charge and appropriate dwelling unit size will be based on Form RD 3560-8 (Tenant Certification), RD Form 3560-7, (Multiple Family Housing Project Budget/Utility Allowance), and the RD-approved project Occupancy Standards/ Policies.

Tenant may request a redetermination of GTC should any of the original determining information change or if he/she believes any determining information or calculations is incorrect.

**SECTION THIRTEEN (MAINTENANCE AND IMPROVEMENTS)**

Tenant shall keep the Leased Premises in safe and sanitary condition and in compliance with all state, federal, municipal, county or other laws, regulations, ordinances or directives, and upon expiration of the Term, extension thereof, or earlier termination of this Lease Agreement, shall deliver the Leased Premises in good order and condition as the same now are, reasonable wear and tear excepted. Tenant agrees not to make alterations, repairs, additions or improvements to the Leased Premises without the prior written consent of Landlord, and that any such alterations, repairs, additions or improvements, whether made by Landlord or Tenant, shall become a part of the Leased Premises and so remain upon expiration of the Term, extension thereof, or earlier termination of this Lease Agreement. Tenant shall not affix any antenna or satellite dish to the exterior of the Leased Premises or Apartment Complex solely except as Landlord may be required to allow by applicable laws and regulations in existence from time to time. Tenant is responsible for all damages to furnishings or the Leased Premises caused by negligence, personally or by an invitee or agent. All charges for maintenance, repairs, and damage are due when billed and are to be paid within five (5) days from date of billing. Landlord shall maintain the buildings and common areas in the Apartment Complex in accordance with applicable building codes and RD Regulations. Notwithstanding any provision of this Lease Agreement to the contrary, Tenant is responsible for the safety of persons and property in and about the Leased Premises and common areas adjacent thereto and is authorized by Landlord to take precautionary steps to accomplish the responsibility of Tenant expressed in this Section Thirteen.

Tenant is responsible for promptly notifying Landlord (in the manner required by Section Fifteen) in writing of any alleged defective or potentially harmful condition existing within or about the Leased Premises, including without limitation water leaks, seepage, steam, rust, mold, "secondhand" tobacco residue or smoke (in "non-smoking units only), mildew, fungus, spores, wet rot or dry rot, electrical problems, malfunctioning lights, broken or missing locks or latches (if supplied by Landlord), and all needed maintenance or repairs (collectively, the "Defects"). Landlord shall have the right to disconnect utilities, relocate Tenant and take any other reasonable steps necessary to make repairs to the Leased Premises and, upon completion of such repairs, Tenant shall reoccupy the Leased Premises. Should Tenant reasonably and legitimately determine any condition of the Leased Premises, except as caused by Tenant, to be dangerous or hazardous to the lawful occupants of the Leased Premises, after written notice to Landlord (in the manner required by Section Fifteen) and expiration of a reasonable amount of time for Landlord to cure the alleged Defects, to the extent hazardous to persons, Tenant may terminate this Lease Agreement and, if all conditions of Section Six are complied with by Tenant, receive a return of the Security Deposit.

**SECTION FOURTEEN (USE, RIGHT TO ENTER)**

The Leased Premises shall be used as a dwelling only and for no unlawful purposes. Tenant agrees to conduct himself/herself and to require others on the Leased Premises with his/her consent to conduct themselves in a manner that is not offensive, noisy, dangerous or otherwise disturbing to other tenants' peaceful enjoyment of the common areas and other rental units in the Apartment Complex. Tenant acknowledges that, should any nuisance abatement or similar proceeding be commenced or threatened against Landlord, Tenant, the Leased Premises or Apartment Complex by any municipal, county, state or federal nuisance abatement or enforcement entity, wholly or partially resulting from the action (or inaction) of Tenant (and guests of Tenant solely as allowed by this Lease Agreement) in, on or about the Leased Premises or Apartment Complex, such action or inaction shall constitute a material breach of this Lease Agreement by Tenant entitling Landlord to all available remedies set forth in this Lease Agreement or by applicable laws.

Landlord reserves the right to enter the Leased Premises at reasonable times without advance notice (1) to inspect the Leased Premises to assure compliance with the terms of this Lease Agreement, (2) to show the Leased Premises to prospective tenants after notice to vacate has been given tenant, and (3) to perform maintenance, make repairs, for pest extermination and for other purposes deemed reasonable by Landlord. Landlord may enter the unit at any time in the event of an emergency. If Tenant refuses to allow access as provided by this paragraph, Landlord may terminate this Lease Agreement and seek all remedies provided by this Lease Agreement or applicable law.

**SECTION FIFTEEN (NOTICE AND TERMINATION)**

Landlord may terminate this Lease Agreement for breach of any term of this Lease Agreement, giving Tenant three (3) days' notice to vacate in writing. Tenant may terminate this Lease Agreement as set forth in Section Thirteen or by providing Landlord thirty (30) days' notice of an alleged default of the Lease Agreement by Landlord, unless Landlord disputes the existence of default, or cures the default prior to expiration of the thirty (30) day period.

Notice to Landlord shall be considered properly served by sending a letter by first-class mail (certified, return receipt requested), properly stamped and addressed, to Landlord at either the management office on the property or the address to which rental payments are mailed or delivered [illegible]

The Landlord and or Management of the Apartment Complex in which you reside may, without obligation to do so, from time to time take certain action(s) designed to increase known security measures. Tenant understands, acknowledges and agrees that such action(s) does not, in any way, constitute an assumption by Landlord and/or Management of any duty to keep persons or property in and around the Apartment Complex safe from intentional misconduct or criminal conduct, and that Landlord and/or Management does not have and disclaims responsibility to protect persons and property in and around the Apartment Complex.

**SECTION SEVENTEEN (FIRE AND CASUALTY)**

If, during the Term of this Lease Agreement, the Leased Premises become damaged by fire or other casualty so as to render the Leased Premises uninhabitable and the time necessary to repair such damage shall not reasonably exceed thirty (30) days from the date of such casualty, Landlord shall make such repairs and Tenant shall resume occupancy of the Leased Premises upon their completion. If the time necessary to repair damages to the Leased Premises caused by any casualty shall exceed thirty (30) days, Landlord may terminate the Lease Agreement on ten (10) days' notice to Tenant.

If the fire or other casualty was not caused by the negligence or willful act of Tenant or his/her employees, family members, agents or visitors, all rental payments due hereunder shall be abated from the date of such casualty to the date of the completion of repairs, calculated on a pro-rata basis. Any unearned rents paid in advance by Tenant shall be refunded or credited to Tenant.

If the fire or other casualty was due to the negligence or willful act of Tenant or his/her employees, family members, agents or visitors, monthly rental payments due hereunder shall not be abated and all expenses of repairing the damage caused by such fire or casualty shall be the responsibility of Tenant and shall be due as set forth in Section Thirteen of this Lease Agreement.

Landlord discloses to Tenant and Tenant agrees and acknowledges that, in the event of a fire or other casualty, Landlord shall not have responsibility for any personal property or fixtures of Tenant within the Leased Premises or the Apartment Complex. Therefore, Landlord strongly recommends and urges Tenant to obtain and maintain insurance on all of Tenant's personal property and fixtures. Tenant is solely responsible for obtaining and paying for any insurance coverage desired by Tenant for the personal property, contents and other property owned by Tenant and located on or about the Leased Premises or the Apartment Complex.

**SECTION EIGHTEEN (RD REQUIRED CLAUSES)**

1. I understand that I will no longer be eligible for occupancy in both the Apartment Complex and the Leased Premises if my income exceeds the maximum allowable adjusted income as defined periodically by RD for Arkansas.
2. I understand that, should I receive occupancy benefits to which I am not entitled due to my/our failure to provide information or due to incorrect information provided by me or on my behalf by others, or for any other household member, I may be required to make restitution and I agree to repay any amount of benefits to which I was not entitled.
3. I understand that income certification is a requirement of occupancy and I agree to promptly provide any certifications and income verifications required by the owner to permit determination of eligibility and, when applicable, the monthly tenant contribution to be charged.
4. Should I no longer meet the occupancy eligibility requirements of the Apartment Complex and should the Leased Premises become overcrowded or under utilized or should I no longer meet the eligibility requirements of the Apartment Complex during the term of this Lease Agreement, I will be required to vacate the Leased Premises at the end of the Lease Term unless eligibility can be established following specified steps, such as moving to an appropriate size unit, or an exception is granted by Landlord. Tenant agrees to move to a unit of appropriate size if Tenant's household size changes.
5. I agree to notify the Landlord of any planned absence of two (2) weeks or more.
6. I agree not to assign this Lease Agreement, or sublet the Leased Premises or any part thereof.
7. I will be permitted to have a guest(s) visit my household. However, Landlord reserves the right to request a recorded declaration of domicile or proof of domicile if it is suspected that the guest is an unauthorized household occupant. Such suspicion may arise whenever an adult person(s) is making reoccurring visits or one continuous visit of 14 days and/or nights in a 45-day period without prior notification to and written consent of the management. Should I or my guest(s) not provide the requested information needed to confirm other domicile, or should the facts be sufficient to evidence domicile in the project, the Landlord will consider such person(s) a member of the Tenant's household and may enforce any covenants in this Lease Agreement shown to be broken and/or require recertification.
8. I understand that, should the Apartment Complex be sold to a buyer approved by RD, this Lease Agreement will be transferred to the new owner.
9. The Apartment Complex is financed by RD and is subject to nondiscrimination provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975, and the Americans with Disabilities Act and complaints may be directed to the Administrator, USDA Rural Development, Washington, D.C. 20250. Complaints of Fair Housing violations may be sent directly to the Secretary of Housing and Urban Development, Washington, D.C. 20410. Any tenant grievance or appeal from Landlord's decision shall be resolved in accordance with procedures consistent with RD regulations covering such procedures which are posted in the rental office or otherwise in the Apartment Complex.
10. I understand that, during the term of this Lease Agreement, no increase in my gross monthly tenant contribution shall take place due to the prepayment of the RD loan which is secured by the Apartment Complex during the Term of this Lease Agreement.
11. I understand that, should any Federal subsidies paid to the Landlord on my behalf be suspended or canceled, due to a monetary or nonmonetary default by Landlord, the monetary payment made by me to Landlord (or when applicable, the monetary payment received by me from Landlord) shall not change over that which would have been required had the subsidy remained in place.
12. It is understood that the use, attempted use, or possession, manufacture, sale, or distribution of an illegal controlled substance (as defined by local, State, or Federal law) while in or on any part of the Apartment Complex is an illegal act. It is further understood that such action is a material violation of this Lease Agreement. Such violations (hereinafter called a "drug violation(s)") may be evidenced upon the admission to or conviction of a drug violation. It is further understood that domestic violence will not be tolerated on Rural Housing properties, and that such action is a material lease violation. All perpetrators will be evicted, while the victim and other household occupants may remain in the unit in accordance with eligibility requirements. The Landlord may require any Tenant or other adult member of the Tenant household occupying the Leased Premises (or other adult or nonadult person outside the Tenant's household who is using the Leased Premises) who commits a drug violation or domestic violence to vacate the Leased Premises permanently, within time frames set by the Landlord, and not thereafter enter upon the Apartment Complex or the Leased Premises without the Landlord's prior consent as a condition for continued occupancy by members of the Tenant's household. The Landlord may deny consent for entry unless the person agrees to not commit any [illegible]

and seek all remedies provided by this Lease Agreement [illegible] law.

**SECTION FIFTEEN (NOTICE AND TERMINATION)**

Landlord may terminate this Lease Agreement for breach of any term of this Lease Agreement, giving Tenant three (3) days' notice to vacate in writing. Tenant may terminate this Lease Agreement as set forth in Section Thirteen or by providing Landlord thirty (30) days' notice of an alleged default of the Lease Agreement by Landlord, unless Landlord disputes the existence of default, or cures the default prior to expiration of the thirty (30) day period.

Notice to Landlord shall be considered properly served by sending a letter by first-class mail (certified, return receipt requested), properly stamped and addressed, to Landlord at either the management office on the property or the address to which rental payments are mailed or delivered.

Notice to Tenant shall be considered properly served by (a) sending a letter by first-class mail to the Tenant at his or her address at the Leased Premises, or (b) by serving a copy of the notice on any adult person answering the door at the leased dwelling unit, or, if no adult person responds, by placing the notice under or through the door, if possible, or else by affixing the notice to the door.

Tenant may terminate this Lease Agreement prior to expiration of the Term for "good cause" such as moving to another location for employment, loss of job, severe illness, or death of spouse or after thirty (30) days' notification by Landlord of intent to prepay.

Tenant shall be deemed as occupying the Leased Premises and bound by this Lease Agreement for as long as any of the Tenant's personal property remains in the Leased Premises after the Tenant has ceased occupancy with the intent to vacate and leave the Leased Premises, until such time the personal possessions have been removed voluntarily or by legal means, subject to the provision of State or local law.

**SECTION SIXTEEN (TENANT ABANDONMENT, LIABILITY)**

Upon voluntary or involuntary termination of this Lease Agreement, all property left in or about the Leased Premises by the Tenant will be considered abandoned and will be disposed of by the Landlord as the Landlord shall see fit without notice to or recourse by the Tenant.

Landlord or his representative or agents shall not be liable to any tenant, occupant, visitor or guest for any personal injury, damage or loss of personal property (furniture, jewelry, clothing, etc.) which occurs in or about the common areas, buildings or other portions of the Apartment Complex by the action or inaction of other tenants or persons (including without limitations theft, burglary, assault, vandalism, or other criminal conduct by any person), fire, flood, water leaks, rain, hail, ice, snow, explosions, interruption of utilities, act of God or other causes.

this Lease Agreement, [illegible] by the [illegible] drug [illegible] upon the admission to or conviction of a drug violation. It is further understood that domestic violence will not be tolerated on Rural Housing properties, and that such action is a material lease violation. All perpetrators will be evicted, while the victim and other household occupants may remain in the unit in accordance with eligibility requirements. The Landlord may require any Tenant or other adult member of the tenant household occupying the Leased Premises (or other adult or nonadult person outside the Tenant's household who is using the Leased Premises) who commits a drug violation or domestic violence to vacate the Leased Premises permanently, within time frames set by the Landlord, and not thereafter enter upon the Apartment Complex or the Leased Premises without the Landlord's prior consent as a condition for continued occupancy by members of the Tenant's household. The Landlord may deny consent for entry unless the person agrees to not commit any drug violations or domestic violence in the future and is either actively participating in a counseling or recovery program, complying with court orders related to a drug violation, or has completed a counseling or recovery program.

The Landlord may require any Tenant to show evidence that any nonadult member of the Tenant household occupying the Leased Premises, who committed a drug violation, agrees to not commit a drug violation in the future, and to show evidence that the person is either actively seeking or receiving assistance through a counseling or recovery program, complying with court orders related to a drug violation, has completed a counseling or recovery program within timeframes specified by the Landlord as a condition for continued occupancy in the Leased Premises. Should a further drug violation be committed by any nonadult person occupying the Leased Premises, the Landlord may require the person to be severed from tenancy as a condition for continued occupancy of the Leased Premises by the Tenant.

If a person vacating the Leased Premises, as a result of the above policies, is one of the Tenants, the person shall be severed from the tenancy and the Lease Agreement shall continue among any other remaining Tenants and the Landlord. The Landlord may also, at the option of the Landlord, permit another adult member of the household to be a Tenant.

Should any of the above provisions governing a drug violation be found to violate any of the laws of the land, the remaining enforceable provisions shall remain in effect. The provisions set out above do not supplant any rights of tenants afforded by law.

©2005 RRHA of ARK (RD approved July 21, 2005)

National Housing Preservation Database (NHPD) (https://preservationdatabase.org/)

# PARAGOULD

## Details

| | |
|---|---|
| NHPD Property ID | 1113950 |
| **Property Name** | **PARAGOULD** |
| Address 1 | AR, Paragould, 115 Bogil Rd |
| Total Units | 14 |
| One Bedroom Units | 4 |
| Two Bedroom Units | 9 |
| Three+ Bedroom Units | 1 |
| Target Population | Family |
| Minimum Construction Date | |
| The Latest Inspection Rate | |

## Subsidies

Active Inconclusive Inactive REAC

| HUD Property ID | HUD Subsidy ID | Subsidy Status | Subsidy Name | Subsidy Subname | Start Date | End Date | Assisted Units | Owner Name | Owner Type | Manager Name | Manager Type | Rent to FMR Ratio | Inactive Status Description | Unpaid Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 412681157011 | Active | RHS 515 | 515 Rural Housing | 06/23/1989 | 06/11/2039 | 11 | PARAGOULD ASSO I LIMITED | Limited Profit | INTERVEST CORPORATION | For Profit | | | 442864.96 |

PAHRC Public and Affordable Housing Research Corporation (https://www.pahrc.org/)

NATIONAL LOW INCOME HOUSING COALITION (http://nlihc.org/)

EXHIBIT 3

The NHPD is protected by copyright. © 2020 Public and Affordable Housing Research Corporation (PAHRC) and the National Low Income Housing Coalition (NLIHC)

Terms of Use (https://preservationdatabase.org/terms-and-conditions/)

Privacy Policy – Effective as of February 9, 2023 (https://preservationdatabase.org/privacy-policy/)

California Privacy Rights (https://preservationdatabase.org/wp-content/uploads/2023/02/2023-NHPD-CA-Privacy-Rights-Notice.pdf)

Disability Rights Arkansas

Dignity. Respect. Advocacy.

**Tom Masseau,** Executive Director

April 23, 2026

Linda Cook
Community Manager
Paragould, Apartments
701 South Street
Mountain Home, AR 72653

**VIA: First Class Mail**

**RE: Tylar Gibson, 219 Bogil Road, Apartment 7, Paragould, AR**

Dear Ms. Cook,

I represent Tylar Gibson. Mr. Gibson is a tenant at the Paragould Apartments in Paragould, AR.

Mr. Gibson has a disability that substantially limits his vision. This disability is clear and obvious to anyone that interacts with him.

Having to walk a long distance through a crowded parking lot is difficult and potentially dangerous for Mr. Gibson. Thus, Mr. Gibson specifically requests that you provide him with a designated parking space close to his apartment. He needs the parking space because he regularly needs to walk to his caregiver's car. He would like the parking space closest to his apartment clearly marked as designated for his use only.

The Fair Housing Act requires you to make reasonable accommodations to individuals with disabilities. 42 U.S.C. § 3604 (f)(3)(b). This includes designating a dedicated parking space. 24 C.F.R. § 100.204.

Please be aware that any attempt to retaliate against Mr. Gibson for making this request would be an additional violation of the Fair Housing Act and would subject you to additional civil liability. 42 U.S.C. § 3617.

Please respond to this letter in writing by May 8, 2026, or I will assume this request has been denied and will assist Mr. Gibson in pursuing appropriate legal remedies.

Jason Auer

Attorney at Law
Disability Rights Arkansas
jauer@disabilityrightsar.org

EXHIBIT
4



EXHIBIT
tabbies
5



Disability Rights Arkansas

Dignity. Respect. Advocacy.

**Tom Masseau,** Executive Director

7/29/2026

Paragould Apartments
Attn: Management
219 Bogil Rd.
Paragould, AR 72450

Via email: paragouldapartments@gmail.com

RE: Written Request for Reasonable Accommodations

To whom it may concern:

We represent Kimberly Gibson, a tenant occupying Unit 12 at Paragould Apartments. If you have retained counsel in this matter, please discuss this letter with your attorney before you respond.

Ms. Gibson has a disability that substantially limits Ms. Gibson's vision. This disability is clear and obvious to anyone that interacts with her.

Due to Ms. Gibson's disability, navigating any significant distance in a parking lot is difficult and dangerous for her. Therefore, Ms. Gibson has requested, as a reasonable accommodation for her disability, that you mark a designated spot, close to her apartment, as reserved for her. At this time, that request is being submitted in writing by Ms. Gibson's attorneys.

Ms. Gibson has also requested the addition of outdoor lighting behind her unit. Like many vision-impaired people, Ms. Gibson has service dogs that are trained to assist her and perform tasks that mitigate her disability. Naturally, her dogs must be taken outside to relieve themselves. On at least one occasion, Ms. Gibson has been unable to make her way back to her unit after taking her dogs out, resulting in an extended period of Ms. Gibson being lost in the dark. If there were a light source, Ms. Gibson could reliably find her way back to her unit at night and have an equal opportunity to enjoy her home.

Accordingly, on or about April 29, 2026, Ms. Gibson requested the installation of



EXHIBIT
tabbies
6

outdoor lighting as a reasonable accommodation for her disability via text message. Ms. Gibson requires this accommodation to enable her to have an equal opportunity to use and enjoy her dwelling. On July 13, 2026, Ms. Cook responded that Paragould Apartments would not purchase lighting for the exterior of the premises. She also included in her response that Paragould Apartments does not currently have maintenance personnel, but that if maintenance is hired, then they could likely install the light. Therefore, Paragould Apartments functionally denied the request apparently on the basis that it would create an undue burden. However, the basis for the denial was unclear, as no effort was made to demonstrate that the request would impose an undue financial burden. As a result, we are making that same request again and requesting supporting documentation for your position.

Additionally, Ms. Gibson has repeatedly requested a remedy for an infestation of rodents (rats and mice) in her apartment. Ms. Cook responded that Paragould would not provide steel wool to fill the access points that are allowing the rodents to navigate the apartment. We are requesting that Paragould Apartments remedy the rodent infestation, repair all damage caused by the rodents, and—as a reasonable accommodation, if necessary—provide steel wool to prevent the infestation from re-emerging in Ms. Gibson's unit.

**Applicable Law**

Paragould Apartments is obligated to make reasonable accommodations for disabled tenants under three different sources of federal law: (1) RHS 515 program regulations; (2) Section 504 of the Federal Rehabilitation Act of 1973 ("Rehab Act"), and (3) the Fair Housing Act.

The regulations for the Section 515 Rural Housing Services subsidy ("RHS 515 subsidy") can be found at 7 C.F.R. Part 3560. Paragould Apartments receives the Section 515 Rural Housing Services subsidy under HUD Subsidy 412681157011. The implementing regulations for the RHS 515 program require recipients to make reasonable accommodations for tenants with disabilities, 7 C.F.R. § 3560.2, and provide "decent, safe, and sanitary housing". 7 C.F.R. § 3560.13(a)(1)(i). Decent, safe, and sanitary housing includes "functional exterior lighting" which "permits safe access and security". 7 C.F.R. § 3560.13(a)(3)(viii). This section also includes a requirement that "all units [be] free of visible signs of insects or rodents" and "free of signs of insect or rodent damage" See 7 C.F.R. § 3560.13 (a)(3)(xxii).

Additionally, Section 504 of the Rehab Act bars discrimination against people with disabilities by any recipient of federal funding (such as the RHS 515 subsidy). 29 U.S.C. § 794.

The Rehab Act also requires covered entities ("recipients" of federal funds) *to provide* accommodations and modifications to otherwise qualified disabled persons unless they impose an undue financial or administrative burden. *Majors v. Housing Authority of DeKalb County Ga.*, 652 F.2d 454, 457 (5th Cir. 1981). *See also Tatro v. State of Texas*, 625 F.2d 557 (5th Cir. 1980). The mere fact that there is some pecuniary cost associated with the accommodation does not alone create an undue burden. *Id.* Instead, the law requires a balancing of the overall costs and benefits. *Whittier Terrace Associates v. Hampshire*, 532 N.E.2d 712, 713 (1989).

The Fair Housing Act is another federal civil rights statute that prohibits covered entities from discriminating against people with disabilities, and it defines disability discrimination as including "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604.

An accommodation is reasonable as a matter of law if it will not impose an undue hardship or burden upon the entity making the accommodation and/or would not undermine the basic purpose which the requirement at issue seeks to achieve. *Shapiro v. Cadman Towers, Inc.* 844 F. Supp 116, 124-5, citing *Southeastern Community College v. Davis*, 442 U.S. 397 (1979).

Ms. Gibson needs to be able to safely leave and return to her home in order to enjoy the benefits of her home. A designated parking spot would make it safe for Ms. Gibson to access her transportation to leave her home, and an exterior light should assist Ms. Gibson with safely returning to her dwelling after taking her service dogs outside. Without an exterior light, Ms. Gibson cannot consistently navigate back to her apartment. Without a reserved parking space, Ms. Gibson cannot safely and consistently locate her transportation. For these reasons, Ms. Gibson requires these accommodations to enjoy the benefits of her housing.

Ms. Gibson's home must also be free of rodent infestation for her to enjoy its benefits; as Ms. Gibson's disability prevents her from mitigating her exposure to rodents and their excrement. Pursuant to 7 C.F.R. § 3560.103 (a)(3)(xvi) and (xxii), Paragould apartments is obligated to repair the access point and holes in Ms. Gibson's walls that were caused by rodents. However, Ms. Cook refused to provide the steel wool that the pest control professionals recommended to prevent prompt re-infestation. We are requesting that Paragould Apartments also provide steel wool to prevent the rodents from promptly reestablishing their access points and re-infesting Ms. Gibson's unit. Ms. Gibson is vision-impaired and cannot enjoy the benefits of her home if there is a rodent infestation that she cannot protect herself from due to her

disability.

Please be advised that in addition to requiring covered housing providers to make reasonable accommodations, the Fair Housing Act and the federal regulations implementing it also make it unlawful to retaliate against a person for exercising their rights under the Act. 42 U.S.C. § 3617; 24 C.F.R. § 100.400. Retaliation can even serve as a separate basis for an FHA claim. *Reyes v. Fairfield Properties*, 661 F. Supp.2d 249 (2009). Any attempt to retaliate against Ms. Gibson for making this request could subject you to additional civil liability. 42 U.S.C. § 3617.

We look forward to your response.

Best regards,

Adrieanna Hutson
Staff Attorney
Disability Rights Arkansas
Disability Rights Arkansas
400 West Capitol Avenue, Ste 1500
Little Rock, AR 72201
Toll Free: 800.482.1174 ext. 110
ahutson@disabilityrightsar.org

Sherry Seiffert
Staff Attorney
Disability Rights Arkansas
Disability Rights Arkansas
400 West Capitol Avenue, Ste 1500
Little Rock, AR 72201
Toll Free: 800.482.1174 ext. 106
sseiffert@disabilityrightsar.org

**NOTICE OF NON-RENEWAL OF LEASE**

Paragould Apartments

Date: July 13, 2026

Tenant: Kimberly Gibson
Unit: Paragould Unit #12

Dear Ms. Gibson,

This letter serves as formal notice that Intervest Corporation has elected not to renew your dwelling lease upon its expiration on November 30, 2026. Your tenancy will terminate at 11:59 p.m. on November 30, 2026, and you are required to vacate the premises and return possession of the unit, including all keys and access devices, on or before that date.

Management has determined that non-renewal is appropriate based upon documented incidents during your tenancy involving repeated disrespectful, disruptive, and harassing conduct directed toward management personnel and other residents. Such conduct is inconsistent with your obligations under the lease to refrain from disturbing or interfering with the rights, safety, and peaceful enjoyment of other residents and to conduct yourself in a manner that does not interfere with the orderly operation of the property.

This action is being taken in accordance with the terms of your lease and the occupancy requirements applicable to USDA Rural

EXHIBIT
tabbies
7

Development-financed housing. Nothing in this notice relieves you of your obligations under the current lease.

You are required to continue paying all rent and any other lawful charges when due through November 30, 2026, and to comply with every provision of your lease until you surrender possession of the unit. Failure to pay rent or otherwise comply with the lease may result in additional action as permitted by law.

If applicable under your lease or USDA Rural Development requirements, you may request any grievance or appeal process available to you within the required time period.

After you vacate, management will inspect the unit and process your security deposit in accordance with your lease and applicable law.

Sincerely,

Erin Hays
District Manager
Intervest Corporation
Erin Hays 07/13/2026
Acknowledgment of Receipt

Tenant Signature: ____________________ Date: __________

NOTICE OF NON-RENEWAL OF LEASE

Paragould Apartments

Date: July 13, 2026

Tenant: Clinton Tyler Gibson
Unit: Paragould Unit #7

Dear Mr. Gibson,

This letter serves as formal notice that Intervest Corporation has elected not to renew your dwelling lease upon its expiration on November 30, 2026. Your tenancy will terminate at 11:59 p.m. on November 30, 2026, and you are required to vacate the premises and return possession of the unit, including all keys and access devices, on or before that date.

Management has determined that non-renewal is appropriate based upon documented incidents during your tenancy involving repeated disrespectful, disruptive, and harassing conduct directed toward management personnel and other residents. Such conduct is inconsistent with your obligations under the lease to refrain from disturbing or interfering with the rights, safety, and peaceful enjoyment of other residents and to conduct yourself in a manner that does not interfere with the orderly operation of the property.

This action is being taken in accordance with the terms of your lease and the occupancy requirements applicable to USDA Rural

EXHIBIT
tabbies
8

Development-financed housing. Nothing in this notice relieves you of your obligations under the current lease.

You are required to continue paying all rent and any other lawful charges when due through November 30, 2026, and to comply with every provision of your lease until you surrender possession of the unit. Failure to pay rent or otherwise comply with the lease may result in additional action as permitted by law.

If applicable under your lease or USDA Rural Development requirements, you may request any grievance or appeal process available to you within the required time period.

After you vacate, management will inspect the unit and process your security deposit in accordance with your lease and applicable law.

Sincerely,

Erin Hays
District Manager
Intervest Corporation
Erin Hays 07/31/2026
Acknowledgment of Receipt

Tenant Signature: ____________________ Date: __________

Disability Rights Arkansas

Dignity. Respect. Advocacy.

**Tom Masseau,** Executive Director

Intervest Corporation
7538 Old Canton Rd.
Madison, MS 39110

Paragould Apartments
219 Bogil Rd.
Paragould, AR 72450

Via email: paragouldapartments@gmail.com

CC: Zach Sellers zachary@arlawpartners.com

RE: Grievance associated with invalid and retaliatory letter of non-renewal

Ms. Hays,

I represent Tylar Gibson in the matter of Paragould Apartments' disability discrimination and retaliation against Mr. Gibson. I am in receipt of your letter entitled "Notice of Non-renewal of Lease." If you have retained counsel in this matter, please discuss this letter with your attorney before you respond.

This letter serves as a letter of grievance, and to inform you that neither your letter itself, nor the proposed non-renewal are compliant with Section 515 regulations. Therefore, your letter is legally invalid to provide my client with notice of intent not to renew his lease. Additionally, you have not alleged facts that would permit Intervest to lawfully refuse to renew my client's lease in November.

Although your letter is invalid to accomplish the purpose of providing notice that Intervest will not to renew Mr. Gibson's lease, it is likely evidence of actionable illegal retaliation under state and federal Fair Housing Acts. Therefore, we intend to include your letter in an Amended Complaint to the AR Fair Housing Commission's Inspector General, provide a copy to the U.S. Department of Agriculture's Office of Civil Rights, and any other appropriate office or agency.



EXHIBIT
9

## **Factual Background**

Paragould Apartments receives the Section 515 Rural Housing Services subsidy under HUD Subsidy 412681157011. Tylar Gibson rents Unit 7 at Paragould Apartments. Mr. Gibson is a person with a physical disability that substantially limits one or more major life activities. Specifically, Mr. Gibson is severely vision-impaired. On or about April 20, 2026, Mr. Gibson requested a reserved parking spot from Linda Cook via text message. Mr. Gibson requires a designated, reserved parking space located near his unit as a reasonable accommodation for his disability. Without a reserved space, he cannot safely and reliably locate and access the vehicle(s) used to transport him, depriving him of an equal opportunity to use and enjoy his dwelling. Ms. Cook denied the request on the basis that it is not the policy of Paragould Apartments to provide designated parking spots. Disability Rights Arkansas ("DRA") also sent a letter making the same accommodation request. Counsel for Paragould Apartments, Zachary Sellers, denied the request without requesting additional information or engaging in an interactive process regarding the request.

In response, on June 25th, 2026, DRA filed a complaint for disability discrimination on Mr. Gibson's behalf with the U.S. Department of Housing and Urban Development ("HUD") and the Arkansas Fair Housing Commission. A copy of that complaint was sent to Intervest/Paragould Apartments.

On July 13th, a Notice of Non-renewal of lease was delivered to Mr. Gibson. That notice did not describe a particular instance of material breach, nor did it point to a particular provision that was allegedly violated. Due to the lack of specific allegations and the timing of the notice, Mr. Gibson and counsel interpret this adverse action as retaliation for filing a complaint under the Fair Housing Act.

## **Applicable Law**

The regulations for the Section 515 Rural Housing Services subsidy ("RHS 515 subsidy") can be found at 7 C.F.R. Part 3560. The section in that part relevant to non-renewal of a lease provides that "Borrowers...may...refuse to renew a tenant's lease **only** for material non-compliance with lease provisions, material non-compliance with the occupancy rules, or other good causes." 7 C.F.R. § 3560.159(a). Further, "termination may only occur when the incidences related to the termination are documented and there is documentation that the tenant was given notice prior to the initiation of the termination action that their activities would result

in occupancy termination." *Id.* The same rules apply when a housing project seeks to terminate a tenant's occupancy by refusing to renew a lease. *Id.* at (b). *See also Majors v. Green Meadows Apartments, Ltd.*, S.D. Ga. 1980, 546 F. Supp. 895.

7 C.F.R. § 3560.159(b) provides the requirements for a valid notice of tenancy termination:

> At a minimum, the occupancy termination notice must include the following information:
> (1) A specific date by which lease termination will occur;
> (2) A statement of **the basis** for lease termination with **specific reference to the provisions of the lease or occupancy rules** that, in the borrower's judgment, have been violated by the tenant in a manner constituting material non-compliance or good cause; and
> (3) A statement explaining the conditions under which the borrower may initiate judicial action to enforce the lease termination notice.

*Id.* at (b).

Section 504 of the Federal Rehabilitation Act of 1973 ("Rehab Act") bars discrimination against people with disabilities by any recipient of federal funding. 29 U.S.C. § 794. The Fair Housing Act also prohibits covered entities from discriminating against people with disabilities, and it defines disability discrimination as including "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604. An accommodation is reasonable if it will not impose an undue hardship or burden upon the entity making the accommodations and would not undermine the basic purpose which the requirement at issue seeks to achieve. *Shapiro v. Cadman Towers, Inc.* 844 F. Supp 116, 124-5, citing *Southeastern Community College v. Davis*, 442 U.S. 397 (1979). An accommodation is not unreasonable merely because it would contradict a traditional rule or practice. *Id.* at 124; *See also* H.R. Rep. No. 711, 100th Cong., reprinted in 1988 U.S.C.C.A.N. 2173. Whether a requested accommodation is reasonable is determined on a case-by-case basis. However, Example (2) included in 24 C.F.R. § 100.204, provides that a reserved parking spot near a resident's dwelling unit is generally a reasonable accommodation—denial of which would be discriminatory—because the accommodation is feasible and practical under the circumstances. The implementing regulations for the RHS 515 program also require recipients to make reasonable accommodations for tenants with disabilities. 7 C.F.R. § 3560.2.

In addition to requiring covered housing providers to make reasonable accommodations, the Fair Housing Acts and the federal regulations implementing it also make it unlawful to

retaliate against a person for exercising their rights under the Acts. 42 U.S.C. § 3617; 24 C.F.R. § 100.400; Ark. Code Ann. § 16-123-208. A refusal to renew a tenant's lease can be considered an adverse action for the purposes of a retaliation claim. *Elmowitz v. Executive Towers at Lido, LLC*, 571 F. Supp.2d 370 (2008). Retaliation can even serve as a separate basis for an FHA claim. *Reyes v. Fairfield Properties*, 661 F. Supp.2d 249 (2009).

As a recipient of a federal housing subsidy, Paragould Apartments is bound by program regulations and Section 504 of the Rehab Act. Therefore, at this time, Tylar Gibson remains entitled to lease renewal, as he has never been provided with notice and an opportunity for a hearing on a lease violation. 7 C.F.R. § 3560.159(a). It is also the position of DRA that Mr. Gibson is legally entitled to a reasonable accommodation concerning his transportation, and that a reserved parking space near his unit would not be unduly burdensome. 7 C.F.R. § 3560.2.

Your letter advising Mr. Gibson that you do not intend to renew his lease is: (1) invalid as it does not cite a specific incident or rule as the basis for non-renewal; and (2) an adverse action constituting actionable retaliation under the Fair Housing Acts.

I look forward to your response.

Best regards,

Adrieanna Hutson
Staff Attorney
Disability Rights Arkansas
Disability Rights Arkansas
400 West Capitol Avenue, Suite 1500
Little Rock, AR 72201
Toll Free: 800.482.1174

Disability Rights Arkansas

Dignity. Respect. Advocacy.

**Tom Masseau,** Executive Director

7/23/2026

Intervest Corporation
7538 Old Canton Rd.
Madison, MS 39110

Paragould Apartments
219 Bogil Rd.
Paragould, AR 72450

Via email: paragouldapartments@gmail.com

CC: Zach Sellers zachary@arlawpartners.com

RE: Grievance associated with invalid and retaliatory letter of non-renewal

Ms. Hays,

We represent Kimberly Gibson in the matter of Paragould Apartments' disability discrimination and retaliation against Ms. Gibson. We are in receipt of your letter entitled "Notice of Non-renewal of Lease." If you have retained counsel in this matter, please discuss this letter with your attorney before you respond.

This letter serves as a letter of grievance, and to inform you that neither your letter itself, nor the proposed non-renewal are compliant with Section 515 regulations. Therefore, your letter is legally invalid to provide my client with notice of intent not to renew her lease. Additionally, you have not alleged facts that would permit Intervest to lawfully refuse to renew my client's lease in November.

Although your letter is invalid to accomplish the purpose of providing notice that Intervest will not renew Ms. Gibson's lease, it is likely evidence of actionable illegal retaliation under state and federal Fair Housing Acts.

**Factual Background**



EXHIBIT 10

Paragould Apartments receives the Section 515 Rural Housing Services subsidy under HUD Subsidy 412681157011. Kimberly Gibson rents Unit 12 at Paragould Apartments. Ms. Gibson is a person with a physical disability that substantially limits one or more major life activities. Specifically, Ms. Gibson is severely vision-impaired. On or about April 29, 2026, Ms. Gibson requested the installation of outdoor lighting as a reasonable accommodation for her disability via text message. Ms. Gibson has service dogs, and requires this accommodation to enable her to have an equal opportunity to use and enjoy her dwelling. Ms. Cook denied the request on July 13, 2026, apparently on the basis that it would create an undue burden.

On that same day, July 13th, a Notice of Non-renewal of lease was delivered to Ms. Gibson. That notice did not describe a particular instance of material breach, nor did it point to a particular provision that was allegedly violated. Due to the lack of specific allegations and the timing of the notice, Ms. Gibson and counsel interpret this adverse action as retaliation for making a request under the Fair Housing Act.

**Applicable Law**

The regulations for the Section 515 Rural Housing Services subsidy ("RHS 515 subsidy") can be found at 7 C.F.R. Part 3560. The section in that part relevant to non-renewal of a lease provides that "Borrowers...may...refuse to renew a tenant's lease **only** for material non-compliance with lease provisions, material non-compliance with the occupancy rules, or other good causes." 7 C.F.R. § 3560.159(a). Further, "termination may only occur when the incidences related to the termination are documented and there is documentation that the tenant was given notice prior to the initiation of the termination action that their activities would result in occupancy termination." *Id.* The same rules apply when a housing project seeks to terminate a tenant's occupancy by refusing to renew a lease. *Id.* at (b). *See also Majors v. Green Meadows Apartments, Ltd.*, S.D. Ga. 1980, 546 F. Supp. 895.

7 C.F.R. § 3560.159(b) provides the requirements for a valid notice of tenancy termination:

> At a minimum, the occupancy termination notice must include the following information:
> (1) A specific date by which lease termination will occur;
> (2) A statement of **the basis** for lease termination with **specific reference to the provisions of the lease or occupancy rules** that, in the borrower's judgment, have been violated by the tenant in a manner constituting material non-compliance or good cause; and
> (3) A statement explaining the conditions under which the borrower may initiate judicial action to enforce the lease termination notice.

*Id.* at (b).

Section 504 of the Federal Rehabilitation Act of 1973 ("Rehab Act") bars discrimination against people with disabilities by any recipient of federal funding. 29 U.S.C. § 794. The Fair Housing Act also prohibits covered entities from discriminating against people with disabilities, and it defines disability discrimination as including "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604. An accommodation is reasonable if it will not impose an undue hardship or burden upon the entity making the accommodations and would not undermine the basic purpose which the requirement at issue seeks to achieve. *Shapiro v. Cadman Towers, Inc*. 844 F. Supp 116, 124-5, citing *Southeastern Community College v. Davis*, 442 U.S. 397 (1979). An accommodation is not unreasonable merely because it would contradict a traditional rule or practice. *Id.* at 124; *See also* H.R. Rep. No. 711, 100th Cong., reprinted in 1988 U.S.C.C.A.N. 2173. The implementing regulations for the RHS 515 program also require recipients to make reasonable accommodations for tenants with disabilities. 7 C.F.R. § 3560.2.

In addition to requiring covered housing providers to make reasonable accommodations, the Fair Housing Acts and the federal regulations implementing it also make it unlawful to retaliate against a person for exercising their rights under the Acts. 42 U.S.C. § 3617; 24 C.F.R. § 100.400; Ark. Code Ann. § 16-123-208. A refusal to renew a tenant's lease can be considered an adverse action for the purposes of a retaliation claim. *Elmowitz v. Executive Towers at Lido, LLC*, 571 F. Supp.2d 370 (2008). Retaliation can even serve as a separate basis for an FHA claim. *Reyes v. Fairfield Properties*, 661 F. Supp.2d 249 (2009).

As a recipient of a federal housing subsidy, Paragould Apartments is bound by program regulations and Section 504 of the Rehab Act. Therefore, at this time, Kimberly Gibson remains entitled to lease renewal, as she has never been provided with notice and an opportunity for a hearing on a lease violation. 7 C.F.R. § 3560.159(a). It is also the position of DRA that Ms. Gibson is legally entitled to a reasonable accommodation concerning lighting outside her apartment, and that Paragould Apartments has put forth no evidence that providing lighting would be unduly burdensome. 7 C.F.R. § 3560.2.

Your letter advising Ms. Gibson that you do not intend to renew her lease is: (1) invalid as it does not cite a specific incident or rule as the basis for non-renewal; and (2) an adverse action constituting actionable retaliation under the Fair Housing Acts.

We look forward to your response.

Best regards,

Adrieanna Hutson
Staff Attorney
Disability Rights Arkansas
Disability Rights Arkansas
400 West Capitol Avenue, Ste 1500
Little Rock, AR 72201
Toll Free: 800.482.1174 ext. 110
ahutson@disabilityrightsar.org

Sherry Seiffert
Staff Attorney
Disability Rights Arkansas
Disability Rights Arkansas
400 West Capitol Avenue, Ste 1500
Little Rock, AR 72201
Toll Free: 800.482.1174 ext. 106
sseiffert@disabilityrightsar.org

Disability Rights Arkansas

Dignity. Respect. Advocacy.

**Tom Masseau,** Executive Director

September 15, 2026

Via Email: ParagouldApartments@gmail.com

Paragould Apartments I, L.P.
c/o Intervest Corp.
219 Bogil Rd.
Paragould, AR 72450

**Re: Demand for Recertification and Lease Renewal**

To Whom it may concern

I am counsel for Kimberly Gibson, a tenant at Paragould Apartments. If you have an attorney in this matter, please provide this letter to your attorney before responding. I am, once again, following up on the "nonrenewal notice" that you sent to Kimberly Gibson dated 7/13/2026. Please consider this a **demand** for a lease renewal appointment.

Ms. Gibson is lawfully in possession of the premises at Paragould Apartments, Unit 12, pursuant to a lease which can *only* be terminated by the landlord for "material noncompliance with the lease provisions, material noncompliance with the occupancy rules, or other good cause." 7 C.F.R. § 3560.159(a). Additionally, "[p]rior to terminating a lease, the borrower must give the tenant written notice of the violation and give the tenant an opportunity to correct the violation." *Id.*

Accordingly, as my previous correspondence informed you, the notice that you sent was of no legal effect. However, neither I nor my client have received any communication since. At this time, my client requires an appointment to recertify her tenancy in advance of her lease renewal.

Please be aware that any action taken to remove my client from her home would be actionable under multiple federal and state claims, and I would immediately file an action to enforce my client's rights. If I am forced to file suit on my client's behalf, please be aware my client could be entitled to damages and you could be even be held liable for her attorneys' fees.



EXHIBIT
tabbies
11

If I or my client do not receive an appointment invitation to recertify my client's tenancy and renew her lease by end-of-day on Friday, October 2nd, 2026; I intend to file a Complaint for housing discrimination and breach of contract against Paragould Apartments LP and its property management company in federal court on Monday, October 5th.

Thank you for your prompt attention to this matter. Please feel free to contact me if you have any questions or would like to discuss the concern further.

Best regards,

*Adrieanna Hutson*

**Adrieanna Hutson**
Staff Attorney
400 West Capitol Avenue, Suite 1500
Little Rock, AR 72201
Direct 501.492.5753
Office: 501.296.1775
Toll Free: 800.482.1174

**Adrieanna Hutson** Outlook

**From:** Adrieanna Hutson
**Sent:** Tuesday, September 15, 2026 3:48 PM
**To:** paragouldapartments@gmail.com
**Cc:** tylar gibson
**Subject:** Demand for Recertification and Lease Renewal

To Whom it may concern

I am counsel for C. Tylar Gibson, a tenant at Paragould Apartments. If you have an attorney in this matter, please provide this letter to your attorney before responding. I am, once again, following up on the “nonrenewal notice” that you sent to Tylar Gibson dated 7/13/2026. Please consider this a **demand** for a lease renewal appointment.

Mr. Gibson is lawfully in possession of the premises at Paragould Apartments, Unit 7, pursuant to a lease which can *only* be terminated by the landlord for “material noncompliance with the lease provisions, material noncompliance with the occupancy rules, or other good cause.” 7 C.F.R. § 3560.159(a). Additionally, “[p]rior to terminating a lease, the borrower must give the tenant written notice of the violation and give the tenant an opportunity to correct the violation.” *Id.*

Accordingly, as my previous correspondence informed you, the notice that you sent was of no legal effect. However, neither I nor my client have received any communication since. At this time, my client requires an appointment to recertify his tenancy in advance of his lease renewal.

Please be aware that any action taken to remove my client from his home would be actionable under multiple federal and state claims, and I would immediately file an action to enforce my client’s rights. If I am forced to file suit on my client’s behalf, please be aware my client could be entitled to damages and you could be even be held liable for his attorneys’ fees.

If I or my client do not receive an appointment invitation to recertify my client’s tenancy and renew his lease by end-of-day on Friday, October 2nd , 2026; I intend to file a Complaint for housing discrimination and breach of contract against Paragould Apartments I LP and its property management company in federal court on Monday, October 5th.

Thank you for your prompt attention to this matter. Please feel free to contact me if you have any questions or would like to discuss the concern further.

Best regards,

Adrieanna Hutson

Staff Attorney
Disability Rights Arkansas
Disability Rights Arkansas
400 West Capitol Avenue, Suite 1500
Little Rock, AR 72201
Toll Free: 800.482.1174
Pronouns: she/her/hers
www.disabilityrightsar.org
Facebook: Disability Rights Arkansas

Notice of Confidentiality: The contents of this e-mail and all files attached hereto may be subject to the attorney/client privilege and/or the attorney client work product doctrine. This e-mail is intended for receipt only by the individual named herein as addressee, and any interception of this message by another, whether accidental or intentional, is in no manner a waiver of any confidentiality or privilege doctrines. If you believe you have received this message in error, please notify the sender immediately and permanently delete this message and all attachments. Anyone other than the intended recipient of this message is forbidden from copying, disseminating, transferring, or any way reproducing or distributing this message, its contents, or its attachments.

Disability Rights Arkansas

Dignity. Respect. Advocacy.

**Tom Masseau,** Executive Director

October 1, 2026

Via Email: ParagouldApartments@gmail.com

Intervest Corporation
7538 Old Canton Rd.
Madison, MS 39110

Paragould Apartments I, L.P.
c/o Intervest Corp.
219 Bogil Rd.
Paragould, AR 72450

**Re: Demand for Recertification and Lease Renewal**

To Whom it may concern:

I am counsel for C. Tylar Gibson and Kimberly Gibson, tenants at Paragould Apartments in Units 7 and 12, respectively. If you have an attorney in this matter, please provide this letter to your attorney before responding. I am, once again, following up on the purported nonrenewal notices that you sent to Tylar Gibson and Kimberly Gibson, dated 7/13/2026. Please consider this a **demand** for a lease renewal appointment.

Tylar and Kimberly Gibson are lawfully in possession of their units at Paragould Apartments, pursuant to a lease which can ***only*** be terminated by the landlord for "material noncompliance with the lease provisions, material noncompliance with the occupancy rules, or other good cause." 7 C.F.R. § 3560.159(a). Additionally, "[p]rior to terminating a lease, the borrower must give the tenant written notice of the violation and give the tenant an opportunity to correct the violation." *Id.*

Accordingly, as my previous correspondence informed you, the notices that you sent were of no legal effect. However, neither I nor my clients have received any communication since. At this time, my clients require appointments to recertify their tenancies in advance of lease renewal.

Please be aware that any action taken to remove my clients from their homes would be

actionable under multiple federal and state claims, and I would immediately file an action to enforce my clients' rights. If I am forced to file suit on my clients' behalf, please be aware my client could be entitled to damages and you could be even be held liable for their attorneys' fees.

If I or my client do not receive an appointment invitation to recertify my client's tenancy and renew his lease by end-of-day on Friday, October 16th, 2026; I intend to file a Complaint for housing discrimination and breach of contract against Paragould Apartments LP and its property management company in federal court on Monday, October 19th.

Thank you for your prompt attention to this matter. Please feel free to contact me if you have any questions or would like to discuss the concern further.

Best regards,

*Adrieanna Hutson*

**Adrieanna Hutson**
Staff Attorney
400 West Capitol Avenue, Suite 1500
Little Rock, AR 72201
Direct 501.492.5753
Office: 501.296.1775
Toll Free: 800.482.1174

CHARLIE CUNNINGHAM
DUSTIN A. DUKE
KATIE L. FREEMAN
JENN C. HENDERSON

ARlaw PARTNERS, PLLC

BETSY M. HICKMAN
ROYCE V. LOBIANCO
ZACHARY T. SELLERS
JALEN TOMS

October 29, 2026

Clinton Tyler Gibson
219 Bogil Road, Apt. 7
Paragould, AR 72450

RE: 30 DAY NOTICE OF LEASE NON-RENEWAL

Dear Mr. Gibson,

I am writing on behalf of your landlord, Intervest Corporation, regarding the premises located at 219 Bogil Road, Apt. 7, Paragould, Arkansas. This letter is to inform you that Intervest Corp. has elected **not** to renew your lease for another term. Per the terms of your lease agreement, your lease of 219 Bogil Road, Apt. 7, Paragould, Arkansas ends on November 30, 2026. Your November rent will be due per the terms of your lease agreement.

Please provide the property manager with your forwarding address, and he will provide you with a refund of any security deposit that is due to you, less deductions for any damages or late charges that you may have incurred during your lease term. An itemization of any deductions of your security deposit will also be provided.

Sincerely,

*Zachary T. Sellers*

Zachary T. Sellers
Attorney at Law
zachary@arlawpartners.com

CC: Intervest Corp

EXHIBIT
tabbies
12

CHARLIE CUNNINGHAM
DUSTIN A. DUKE
KATIE L. FREEMAN
JENN C. HENDERSON

ARlaw PARTNERS, PLLC

BETSY M. HICKMAN
ROYCE V. LOBIANCO
ZACHARY T. SELLERS
JALEN TOMS

October 30, 2026

Kimberly Gibson
219 Bogil Road, Apt. 12
Paragould, AR 72450

RE: 30 DAY NOTICE OF LEASE NON-RENEWAL

Dear Ms. Gibson,

I am writing on behalf of your landlord, Intervest Corporation, regarding the premises located at 219 Bogil Road, Apt. 12, Paragould, Arkansas. This letter is to inform you that Intervest Corp. has elected **not** to renew your lease for another term. Per the terms of your lease agreement, your lease of 219 Bogil Road, Apt. 12, Paragould, Arkansas ends on November 30, 2026. Your November rent will be due per the terms of your lease agreement.

Please provide the property manager with your forwarding address, and he will provide you with a refund of any security deposit that is due to you, less deductions for any damages or late charges that you may have incurred during your lease term. An itemization of any deductions of your security deposit will also be provided.

Sincerely,

*Zachary T. Sellers*

Zachary T. Sellers
Attorney at Law
zachary@arlawpartners.com

CC: Intervest Corp

EXHIBIT
tabbies
13